### WRIGHT CO. v. HERRING-CURTISS CO. et al.

(District Court, W. D. New York. February 21, 1913.)

#### No. 400.

**1. PATENTS (§ 328\*)—VALIDITY AND INFRINGEMENT—FLYING MACHINE.**

The Wright patent, No. 821,393, for a flying machine, is for a combination which was not anticipated, and by the means shown of securing the equilibrium of the planes made an important advance in an embryonic art. If not strictly for a pioneer invention, in the sense of producing an apparatus novel in its entirety, in such means it surpassed anything in the prior art, and is entitled to a liberal construction. Claims 3, 7, 14, and 15 also *held* infringed by the Curtiss aëroplane.

**2. PATENTS (§ 53\*)—SUIT FOR INFRINGEMENT—DEFENSES—PRIOR STRUCTURES.**

An invention or discovery set up in defense of infringement must have been complete and capable of producing the desired result.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 71; Dec. Dig. § 53.\*]

**3. PATENTS (§ 177\*)—CONSTRUCTION AND VALIDITY OF CLAIMS—SUBCOMBINATION.**

It is not essential to the validity of a claim of a patent that all parts of the machine, or all parts specified in other claims, which are necessary to its operativeness, should be included therein; but where the patent is for a combination, a claim may be for a subcombination, which, although not operative alone, is new and capable of co-operating with other things, which would be understood by those skilled in the art, or for which reference may be had to the specification, to produce a useful result.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 253, 254; Dec. Dig. § 177.\*]

In Equity. Suit by the Wright Company against the Herring-Curtiss Company and Glenn H. Curtiss. On final hearing. Decree for complainant.

For former opinions, see 177 Fed. 257, and 180 Fed. 110, 103 C. C. A. 31.

H. A. Toulmin, of Dayton, Ohio (Frederick P. Fish and Edmund Wetmore, both of New York City, of counsel), for complainant.

Emerson R. Newell, of New York City (J. Edgar Bull, of New York City, of counsel), for defendants.

HAZEL, District Judge. This bill in equity relates to the infringement of United States letters patent granted May 22, 1906, to Orville and Wilbur Wright on application for patent filed March 23, 1903, for improvements in flying machines, or, in other words, for a structure commonly known as an aëroplane. At this date, owing to articles in daily papers and periodicals with regard to notable flights in this

country and abroad by the late Wilbur Wright, Orville Wright, defendant Glenn H. Curtiss, and other venturesome aviators, the aëroplane and the modus operandi thereof are reasonably familiar to the intelligent public. That such structures are supported in their flight by the reaction of the air against an inclined surface, and that the advancing air presses against the plane surfaces, thereby inclining them to rise, while at the same time a resistance to forward motion is encountered, which is overcome by the propelling motor, are facts now reasonably familiar to us.

[1] By those who early studied the art the fundamental physical principles involved in the flight of a plane heavier than air, when advancing against the wind or currents of air, were well recognized. That a plane descending in response to the force of gravity naturally inclined in a forward direction, and that the air resisted its forward descent in proportion to the exposed surface of the plane, were matters thoroughly understood by those who were interested in the subject. This knowledge eventuated in the structures for aërial flying shown in the exhibit publications and in the Wright patent in suit. The objects of the latter, according to the specification, are:

"To provide means for maintaining or restoring the equilibrium or lateral balance of the apparatus, to provide means for guiding the machine both vertically and horizontally, and to provide a structure combining lightness, strength, convenience of construction, and certain other advantages which will hereinafter appear."

There are 18 claims in the patent; but claims 3, 7, 14, and 15 only are infringed, and they read as follows:

"3. In a flying machine, a normally flat aëroplane having lateral marginal portions capable of movement to different positions above or below the normal plane of the body of the aëroplane, such movement being about an axis transverse to the line of flight, whereby said lateral marginal portions may be moved to different angles relatively to the normal plane of the body of the aëroplane, and also to different angles relatively to each other, so as to present to the atmosphere different angles of incidence, and means for simultaneously imparting such movement to said lateral marginal portions, substantially as described."

"7. In a flying machine, the combination with an aëroplane, and means for simultaneously moving the lateral portions thereof into different angular relations to the normal plane of the body of the aëroplane and to each other, so as to present to the atmosphere different angles of incidence, of a vertical rudder, and means whereby said rudder is caused to present to the wind that side thereof nearest the side of the aëroplane having the smaller angle of incidence and offering the least resistance to the atmosphere, substantially as described."

"14. A flying machine comprising superposed connected aëroplanes, means for moving the opposite lateral portions of said aëroplane to different angles to the normal planes thereof, a vertical rudder, means for moving said vertical rudder toward that side of the machine presenting the smaller angle of incidence and the least resistance to the atmosphere, and a horizontal rudder provided with means for presenting its upper or under surface to the resistance of the atmosphere, substantially as described.

"15. A flying machine comprising superposed connected aëroplanes, means for moving the opposite lateral portions of said aëroplanes to different angles to the normal planes thereof, a vertical rudder, means for moving said vertical rudder toward that side of the machine presenting the smaller angle of incidence and the least resistance to the atmosphere, and a horizontal rudder provided with means for presenting its upper or under surface to

the resistance of the atmosphere, said vertical rudder being located at the rear of the machine and said horizontal rudder at the front of the machine, substantially as described."

The following is a perspective view of the Wright machine:

The defenses are: (1) That the patent is not entitled to a broad construction; (2) that, if it is broadly construed, it is invalid in view of the prior art; (3) that, if properly construed as to its scope, the defendants do not infringe; and (4) that in any event defendants' mode of flying is on a different principle from complainant's.

The record is replete with publications and oral testimony showing that the principal obstacle to the use of the aëroplane before the invention in suit was the inability to maintain lateral balance, due to disturbing aërial forces which swerved the aëroplane from its intended course. Indeed, this was the perplexing problem upon which human flight depended and the one with which the patentees had to cope. The specification says:

"In flying machines of the character to which this invention relates the apparatus is supported in the air by reason of the contact between the air and the under surface of one or more aëroplanes, the contact-surface being presented at a small angle of incidence to the air. The relative movements of the air and aëroplane may be derived from the motion of the air in the form of wind blowing in the direction opposite to that in which the apparatus is traveling, or by a combined downward and forward movement of the machine, as in starting from an elevated position, or by combination of these two things, and in either case the operation is that of a soaring machine, while power applied to the machine to propel it positively forward will cause the air to support the machine in a similar manner."

Much, indeed, prior to the Wright patent, had been written on the subject of aërial machinery by Prof. Langley, of the Smithsonian Institute, Octave Chanute, and others, and there were a number of patents in this country and in foreign countries disclosing diligent and painstaking efforts by inventors to achieve success in aërial navigation with heavier than air machines; but all such efforts for one reason or another were abortive, and the intentions of the inventors and experimenters miscarried. The prior art taught that Langley, Lilienthal, Chanute, Maxim, and others had faithfully endeavored to solve the difficulties and remedy the imperfections in apparatus. Flying machines of various kinds had previously been built, but no one had flown save a few, Chanute in this country, and Lilienthal and Pilcher abroad, who were engaged in experimentation.

In this situation the patentees conceived the idea of hinging dihedral planes to supports at their front and rear margins, with flexible joints to permit warping or tilting them at their extreme lateral ends by the use of suitable levers to impart to the aëroplane surface a helicoidal twist. On this point the specification says:

"We prefer this construction and mode of operation for the reason that it gives a gradually increasing angle to the body of each aëroplane from the central longitudinal line thereof outward to the margin, thus giving a continuous surface on each side of the machine, which has a gradually increasing or decreasing angle of incidence from the center of the machine to either side. We wish it to be understood, however, that our invention is not limited to this particular construction, since any construction whereby the angular relations of the lateral margins of the aëroplanes may be varied

in opposite directions with respect to the normal planes of said aëroplanes comes within the scope of our invention."

It was believed in the beginning that, by warping or depressing the margins of the supporting planes at opposite ends, the aëroplane could be controlled in its movements and its equilibrium maintained in flying, and the proofs show that in their earlier efforts the inventors did not design to use either a horizontal rudder in front of the machine or a vertical rudder at the rear; but later, before the application for patent was filed, these instrumentalities were added. The movable vertical rudder or tail exerts a retarding influence on the side of the machine, which in flying has a tendency to move ahead of the opposite side, and thus assists the wings or marginal ends in keeping the aëroplane properly balanced.

Means were provided for increasing or decreasing the angle of incidence to restore lateral balance, such means consisting of a rope attached both to the vertical rudder and to the wings or margins, which enabled the aviator, lying in the cradle, to operate by the motion of his body both instrumentalities for maintaining the equilibrium of the apparatus. In the estimation of the Wright brothers the machine was prevented from turning on its vertical axis by the adaptation of the movable vertical rudder as an auxiliary to the warping planes or ailerons as described in the specification, and by the conjoint use of such parts they were able to fly, steering in either direction, and to restore and retain equilibrium.

To induce a construction of the claims in controversy that will exclude defendants' aëroplanes, it is contended that the patentees merely improved the known gliding machine—a contrivance for gliding down slopes—and that the wing tips, horizontal rudder, and vertical rudder were old separately and in combination. In the year 1896, and previously, Lilienthal had flown experimentally with a gliding machine which was afterwards wrecked. Later, the Pilcher and Chanute structures, of both the monoplane and biplane type, were used for experimental flying; but they also were failures, and little success was achieved in correcting their imperfections.

In a published address by Chanute, who had carefully studied the subject of aëro-dynamics and disclosed a keen familiarity with flying machines of the aëroplane type, there is contained a percursory review of the aëroplane and its practicability up to the year 1897. In this address he points out the differences between curved and flat planes with regard to the effect of air pressure thereon; but his descriptions were not sufficiently definite to suggest the later improvements by the patentees. He declared that the use of a horse power motor to facilitate flight, if of sufficiently light weight, was a minor detail and not a serious problem, and that the maintenance of the equilibrium was the most important problem in connection with aërial navigation. While his experimentation and publications were helpful to the patentees, it is not contended by the defendants that they were anticipatory of the

claims in suit, but merely that they showed the progress that had been made in efforts to make possible human flight.

That the prior patents do not show the patented combination of complainant's construction is evident from an examination thereof.

The Henson British patent of 1842 was for a monoplane having two pivoted tails independently operated—one a horizontal tail, controlling the upward and downward movements of the apparatus; the other a vertical tail, guiding its direction. The statement in the specification as to the dimensions of the machine indicates its impracticability, and there is nothing to show that the patentee had in mind the principle that the steering or control of the machine depended upon the tilt of the wings in connection with the use of the vertical rudder.

In the Maxim British patent, No. 16,883, of 1889, for an aërial machine, there is a vertical movable rudder and a horizontal rudder—the former for guiding the aëroplane in an upward or downward direction, and the latter for steering to right or left. While the function of the Maxim horizontal rudder was apparently the same as that of the Wright horizontal rudder, the function of the vertical rudder was essentially different.

In the Lanchester British patent, No. 3,608, the intention of the patentee was to secure the lateral balance of his aërial machine by automatic means. He, however, never succeeded in carrying out his design. In addition to the horizontal rudder, his machine carried a rear rudder, which was used for steering, and not for maintaining the equilibrium of the contrivance, and the wings were immovable.

The patents to Crepar and Johnston for gas balloons, lighter than air, were provided with horizontal and vertical rudders; but such rudders did not perform the function of the Wright movable vertical rudder in combination with the marginal tips. However, apparatus of this description, even though provided with planes, and horizontal and vertical rudders, bears no close similarity to machines of the type under consideration, as lateral balance is secured upon an entirely different principle.

In the description of the Harte British patent, No. 1,469, of 1870, it is stated that the wings of the machine when in operation form a single plane, moving through the air in the direction of least resistance, and that they have hinged to the ends triangular extensions, called by the defendants aileron portions, which afford means for steadying the apparatus. While the extensions may be movable above and below the normal plane of the main body, yet there is no simultaneous manual control, and therefore, in my opinion, the described means do not correspond to the combination in claim 3 of the Wright patent, and as the vertical steering rudder of the Harte patent is not usable to maintain steadiness or balance, the elements of claims 7, 14, and 15 are not disclosed.

The Mouillard patent, No. 582,757, for a glider, bears more particularly on claim 3, and is said to contain aileron portions on the sides of the planes. The description is of a monoplane surface with

separate portions at the rear of each wing (light nets of silk twist $J'$, with meshes about 2 inches square under the frame of the wings), which are movable by cords extending to the operator. This structure was never reduced to practice. The specification in no way indicates that Mouillard considered the problem from the viewpoint of the patentees; nor does it show means for simultaneously increasing the lift of one aileron and depressing the other, or for simultaneously adjusting the ailerons above or below the horizontal plane; nor does it show the use of a rudder in connection with the depressible portions. The complainant's expert witnesses expressed the opinion that the depression of one wing operated to turn the apparatus, and not to balance it.

[2] Much has been said by defendants of the Boulton British patent, No. 392, of 1868, for aërial locomotion relating principally to the generation of the motive force used. The inventor of apparatus connected therewith appreciated the necessity for lateral stability in such constructions. Figure 5, attached to the drawing, shows vanes which are located on the sides of the machine and which constitute its ailerons. There are rudders which are designed to prevent the machine from being turned on its axis from the pressure of the air, and side vanes which may be turned around, according to the patent, like a "throttle valve." Defendants argue that such patent discloses the elements of claim 3 in suit; but complainant has shown with reasonable certainty that the pressure on the lateral vanes would be such as would not only turn one upward and the other downward, but that it would also pull the weight $d$ (shown in Fig. 5) to one side, with the result that the apparatus would become unbalanced. The side vanes of the patent to Boulton did not, in my opinion, suggest the lateral marginals of the patent in suit. While the vanes were operated from their normal position in a somewhat similar way to complainant's marginal wings when the apparatus was rotated, yet there was no manual control of the side portions as in complainant's machine. It is true that the vanes are said to be operated by hand, although a self-acting mechanism in connection with their control is also specified, but which, I think, was inoperative, even though stops were used to prevent the vanes from completely turning or from moving to and fro. Although Boulton theoretically understood the probable disturbances due to air pressure, his self-acting mechanism for controlling and safely directing his machine amounted to little, and his assertions and suggestions were altogether too conjectural to teach others how to reduce them to practice, and therefore his patent is not anticipatory. American Graphophone Co. v. Leeds & Catlin Co., 170 Fed. 327, 95 C. C. A. 511. Nor does the Boulton structure weigh with me sufficiently to require a limitation of claim 3, for it is well settled that an invention or discovery set up in defense of infringement must have been complete, and capable of producing the desired result, and there is no such showing here. Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821.

Importance is attached to the revived Mattulath application for a patent, dated January 8, 1900; but I think there is an utter failure to show that the catamaran-like structure of 180 feet over all and revolving disk 40 feet in diameter, with its decks, compartments, and machinery, was complete, or that it was even remotely possible to reduce it to practice, and without such showing it is devoid of material significance. Even assuming that it belongs to a prior art, the structure is not provided with movable side ailerons simultaneously adjustable, or a movable rudder, but has a fixed rudder, which has no connection with the ailerons.

One additional publication, the Ader article, published in France in 1893, may be dwelt upon. The conception of Ader relates to apparatus for flying which somewhat resembles the wings of birds or bats, having tips which, according to the specification, could be moved forward and backward. The machine was of the monoplane type, and carried a motor; but, as there was no connection between the warping features and the rudder by which the lateral balance of the machine was secured, the publication is not entitled to be considered in limitation of the claims in suit embodying such elements.

Challenging the claim of the patentees that equilibrium is maintained by the connection between the rear rudder and the warping tips, the defendants point to the Voisin machine (model exhibit)—a structure without warping means or its equivalent, but having a rear rudder for steering and maintaining balance. Such device, however, is provided with vertical end surfaces which impart lateral resistance to air pressure, while in complainant's and in defendants' aëroplanes the ends are open, the air passing through without resistance, and therefore the principle of operation in the Voisin structure is essentially different.

The Schroeder German patent of 1894, upon which the defendants lay stress, is for a gas balloon, a structure lighter than air, having a flat under surface and a slanting upper surface, a steering rudder operated by a single lever, and two wings, one at each end of the under side of the plane for maintaining equilibrium. Defendants' expert witness Waterman expressed the opinion that the Schroeder structure was readable on claims 3 and 7 of the Wright patent, and testified that the ailerons were movable automatically, although, if desired, they might be controlled by hand. The specification shows that in the center of the under side of the balloon there was suspended a car in which the operator was seated, who, by inclining his body from side to side, obtained lateral balance by the movement of the wings, which were automatically controlled by the tipping of the machine. The wings, which I think were merely incidental to the construction, without being regarded as of the essence thereof, were mounted on a horizontal shaft extending from one end of the contrivance to the other; but they did not extend beyond the normal plane, as do the ailerons of the defendants' machine. There is conflict of evidence as to whether such patent discloses means for simultaneously moving the rudder

and the wings. From my examination thereof, I conclude that there was no such co-ordination between the vertical rudder and the wings as would enable their simultaneous movement to restore lateral balance. At any rate, as hereinbefore stated, there is a wide distinction between a gas-containing machine designed for aërial navigation and an aëroplane. In the former there is a gradual descent to terra firma, either from loss of gas or because of increased weight; while in an aëroplane the descent is precipitous.

No useful purpose would be served by the consideration of other contrivances. A summary of what had gone before in aërial machinery unmistakably discloses, first, publications which did not contain descriptions of apparatus of such clearness and definiteness as to enable the skilled in the art to construct therefrom an operative device, or clearly suggesting ways or means to solve the problem of lateral balance; and, second, exhibit patents which, as Judge Coxe says in Cimiotti Unhairing Co. v. American Unhairing Co., 115 Fed. 498, 53 C. C. A. 230, "emerged from oblivion solely to meet the exigencies of the occasion," and which contain undeveloped plans or ideas for constructions incapable of successful operation. As the defendants have not proven that the defects attributable to such devices could have been removed by the exercise of the skill and training of an engineer or mechanic, I am of opinion, after complete consideration of the testimony on both sides, that the patentees, by their method of securing the equilibrium of the planes, made an important advance in an embryonic art. They were not the first to conceive the idea of using monoplane or biplane surfaces for flying, nor the first to support two planes at their margins one above the other, or to use vertical tails or rudders for steering, or to place horizontal rudders forward of the machine to guide it upward or downward in its flight. The prior separate use of such elements is freely admitted by the patentees; but they assert, rightly, I think, that the patented combination was a new combination, performing a new and novel result. The antecedent patents, the efforts to perfect the gliding machine and to provide means for restoring equilibrium, in short, the many unsuccessful attempts to remedy existing imperfections in aërial machinery, all bear witness to the fact that the achievement of the patentees required the exercise of the inventive faculty. Having attained success where others failed, they may rightly be considered pioneer inventors in the aëroplane art. Their concept was practical, and their combination of old and new elements meritoriously advanced the operativeness of aëroplanes of this type from which astonishing flights have resulted.

Of course, it is not intended to decide, and such decision should not be inferred from what has been stated, that by the adaptation described in the specification and claims in suit the capsizing or upsetting of the aëroplane has been made impossible or its stability in the air positively assured; for this is not contended. But that the invention is a strong factor in restoring equilibrium where, owing to the fluctuations of the wind or to other disturbing causes, the aëroplane is shifted or swerved from its course, is undoubtedly proven. When such deflections occur,

the warping device, imparting to the aëroplane surface a helicoidal twist, is used, and at the same time the vertical rudder is turned to recover the equilibrium. And even if the patentees were not strictly pioneers, in the sense of producing an apparatus novel in its entirety, they nevertheless strikingly surpassed their predecessors in devising means for restoring lateral balance, and are entitled to a liberal construction of their claims in controversy, and to the application of a range of equivalents that will include an aëroplane appropriating substantially the same instrumentalities and the same principle of operation.

The defendants urge that the patentees' invention is without practical utility, that the flat planes described in the specification were never used, that the vertical rudder is useful merely to equalize resistance, that the patent fails to disclose the manner of effecting the equalization of the differences of air pressure, and argue that in turning complainant's machine the ailerons are warped, with the result that the aëroplane swings or circles toward the side on which the greater angle of incidence was produced, that by such maneuvering to prevent upsetting complainant's machine has to be turned from its course, it being impossible to further turn the vertical rudder, and they argue that defendants' aëroplane is radically different from complainant's. They also claim that it was not until the vertical rudder was constructed to move independently of the ailerons, as in defendants' aëroplane, that an operative device was produced.

In the specification the surfaces of the planes are described as "normally substantially flat," and in the claims they are referred to as "normally flat," and it is stated that, when the supporting surfaces are made of cloth or other flexible fabric, a curvature is imparted to the planes by the resistance of the air. But the patentees did not limit themselves to the precise details of construction, and they stated in their specification that the same might be modified without departing from the principle of the invention. The patentees evidently believed that the curved surfaces would be made normally flat in view of the flexibility of the material originally used by them, and that to their surfaces there would be imparted a curvature by air pressure. They were required by law merely to state the best manner known to them of embodying their invention in a complete practical structure, and were not limited to the specific form, or to the best form known to them, if their claims were broad enough to entitle them to equivalents. Columbia Motor Car Co. v. C. A. Duerr & Co. et al., 184 Fed. 893, 911, 107 C. C. A. 215.

The defendants assert that curved surfaces impart lifting advantages to the planes, and also increase the stability of the planes, and that the patentees purposely refrained from disclosing the best form of their apparatus, intending by a faulty description to mislead the public. In answer, however, it suffices that the evidence does not support any such view.

To the aëroplanes later constructed by the complainant there has been added a supplemental lever for turning the vertical rudder, which,

as shown by the evidence, is used to increase the swing of the machine in one direction or another, when the conditions are such as to necessitate turning the rudder further to the right or left to retard the speed of the right or left wings than can be done by using the cradle. This alteration or additional feature was not necessary to the practicability or operativeness of the invention; such rudder still being relied upon in connection with the warping instrumentality.

Defendants further contend that the patent is silent regarding the use of a motor, and that therefore it was never intended to pass beyond the gliding machine stage; but this is incorrect, as the specification expressly alludes to flying either by the application of mechanical power or gravity. Moreover, the use of motors in aërial machinery was not a new idea, and was never regarded as a knotty problem.

[3] There was much discussion at the bar as to claim 3, which does not include the vertical rudder as an element. The important feature thereof is that the lateral marginal portions of the planes must be capable of movement to different angles relatively to the normal plane of the aëroplane and about an axis transverse to the line of flight; the purpose of said movements being to present to the atmosphere different angles of incidence. It was argued that without the co-operation of the vertical rudder the claim was wholly impracticable. The complainant company, to the contrary, rejoins that there is shown a sub-combination which is valid, and which should be sustained. There is evidence that the marginal ends of the supporting planes are capable of moving simultaneously in different angular relations to the plane and to each other without the assistance of the vertical rudder; but the result was not satisfactory as the machine in its flights skidded to the side, an imperfection which has been remedied by the use of the vertical rudder in conjunction with the ailerons. It is not essential to the validity of claim 3 that all parts of the machine, or all parts specified in other claims, which are necessary to its operativeness, should be included therein, and resort must be had to the specification for a disclosure of the parts necessary to insure the practicability of a patented device. In the Wright structure a new and novel result was attained simply by having the ailerons on the ends of the planes, without the supplemental feature of the vertical rudder. The warping feature is, in fact, the essential part of the machine, while the vertical rudder, insuring successful flying, is a valuable adjunct, without which lateral balance could not be restored. The employment, in a changed form, of the warping feature or its equivalent by another, even though better effects or results are obtained, does not avoid infringement. In such circumstances, as I read the authorities, the claim is valid as a subcombination. Thomson-Houston Electric Co. v. Black River Traction Co., 135 Fed. 759, 68 C. C. A. 461; Deering v. Winona Harvester Works, 155 U. S. 286, 15 Sup. Ct. 1187, 39 L. Ed. 153; Taylor et al. v. Sawyer Spindle Co., 75 Fed. 301, 22 C. C. A. 203. In Railroad Co. v. Dubois, 12 Wall. 47, 20 L. Ed. 265, the Supreme Court of the United States says:

"Undoubtedly a patentee may claim and obtain a patent for an entire combination, or process, and also for such parts of the combination or process as are new and useful, and he may claim and obtain a patent for both."

In Thomson-Houston Electric Co. v. Black River Traction Co., supra, Judge Wallace, writing for the Circuit Court of Appeals, said:

"Many subcombinations, although new, are not useful, except to perform their appropriate functions in the machine of which they are a part. The description in the patent of the whole machine, and of the means or mode by which the subcombination is brought into co-operative relation with the other parts, usually indicates how the subcombination may effect a useful result. When this is so the combination need not be operative alone, because (to use the language of Mr. Walker) 'utility is justly ascribed to things which have their use in co-operating with other things to perform a useful work.' In Taylor v. Sawyer Spindle Co., 75 Fed. 301, 309, 22 C. C. A. 203, 211, in considering the objection that the claims by themselves were void, because not composing an operative mechanism, the court said: 'The law upon this subject is too well settled to be open for discussion. A patentee is not required to claim the entire machine in each claim. Each of the claims at issue is for a complete combination of the spindle and its supporting tube and devices, and there was no necessity for expressing in terms the devices for revolving the spindle. Any appropriate means for operating it will be understood. The omission of the sleeve wheel does not affect the validity of either of the claims, which belong to that class where reference may be made to the specification to supply in a claim what is plain to any one skilled in the art.' "

To a similar effect, see Canda et al. v. Michigan Malleable Iron Co., 124 Fed. 486, 61 C. C. A. 194, and Clark Blade & Razor Co. v. Gillette Safety Razor Co., 194 Fed. 421, 114 C. C. A. 383. The doctrine of such adjudications may appropriately be applied to the situation presented herein. Consideration has already been given the patents to Mouillard and Boulton, which show lateral extensions, and which, it is asserted, limit claim 3, and nothing further need be added to the criticism elsewhere made.

It is next contended that defendants' aëroplane does not infringe claim 3, as its ailerons do not move in either direction above or below the normal plane of the body portion; but any such alteration, however, is immaterial, as defendants' planes move at different angles relative to the aëroplane and to each other, and attain the substantial result of the Wright patent.

Claim 7 is for the elements of (1) an aëroplane; (2) means for moving the ailerons in different directions; (3) a vertical rudder; and (4) means for operating the rudder causing it to "present to the wind that side thereof nearest the side of the aëroplane having the smaller angle of incidence, and offering the least resistance to the atmosphere, substantially as described." The description of the modus operandi of the rear rudder plainly discloses its object and purpose, and is not restricted to the warping ropes or wires. Claim 14 includes the horizontal rudder, with means for presenting its underside to the resistance of the air currents, while claim 15 specifies the location on

the aëroplane of the vertical and horizontal rudders. The said claims must be given an interpretation of sufficiently wide scope to cover the appropriation of the substance of the invention or the equivalent means by which the principle is applied to an aëroplane of the type described in the patent in suit.

This brings me to the final question of whether or not there is in defendants' machine a tendency to spin or swerve, which is checked or counteracted by the operation of its vertical rudder. Upon this phase of the case considerable oral testimony was given bearing upon the practical and theoretical sides. Notwithstanding the construction to which the claims are thought entitled, if the defendants operated their aëroplane upon a different principle, using means which were old in aërial navigation or foreign to complainant's, then infringement cannot be sustained.

The evidence is that the defendants in their machine have two slightly curved planes supported by rigid posts placed vertically to the planes at the front and rear sides, the ends thereof being open the entire length, and that there are two ailerons or wings on the extreme sides of the planes, each pivoted to supports and crosspieces midway between the upper and lower planes. Such ailerons or supplementary planes are extended in part beyond the edges of the main planes, and are not continuous or integral portions thereof, as are complainant's. They are adjustable at different angles, and are raised and lowered by the lateral movement of the body of the aviator, who is seated in a movable seat in the central portion of the aëroplane. Each aileron has the same angle to the supporting props as the other, and as the angles of incidence of the planes change in flying the angles of the ailerons also change, each presenting unequal angles and resistances. In consequence of such variation in the angles of the ailerons, the speed of the high and low sides varies whenever the planes are tilted from the normal angle. At the rear of defendants' construction there is a vertical rudder, and there is a sharp question of fact as to whether such rudder is used to assist the ailerons in recovering lateral balance by retarding the speed of the high side and increasing the speed of the opposite side. If it is not so used, then in my opinion the defendants' machine is not operated on the principle of claims 7, 14, and 15 in suit. The claim is that such rudder is operated in a manner to compensate for the difference in head resistance on the ailerons, due to the unequal angles caused by the continuous alteration of the angle of incidence of the machine, or, in other words, that the defendants' rudder is turned to the high side because of the unequal resistance exerted by the ailerons. This mode of operation the defendants earnestly deny, and there is much dispute in regard thereto.

In front of their machine the defendants also use a horizontal rudder, which directs the upward and downward course, and which may be maneuvered by the aviator to coact with the ailerons and the

204 F.—39

vertical rudder. The following is a perspective view of defendants' machine:

If I am correct in my interpretation of claim 3 and the rule of law applicable thereto, the ailerons of defendants' construction and the manner of using them are within its scope. The witness Curtiss frankly testified that the purpose thereof is to preserve the lateral balance "without the use of any other element or part"; it making no difference whether the aëroplane is in a straight or curved flight. Such concession supports the asserted infringement of the claim under consideration. There is, however, other testimony showing the specific manner in which the result is attained. The witnesses for complainant have sworn that in defendants' construction the aviator to restore lateral balance causes the ailerons to be lowered or raised, thus increasing the angle of incidence of one while decreasing that of the other, by inclining his body and moving his seat towards the high wing. It is true that the vertical rudder is not connected so as to coact with the ailerons, there being no direct connection between them, but each is controlled separately. According to the evidence, a turning effect is at times produced in defendants' machine by air disturbances, to counteract which the right aileron of defendants' machine may be pulled downward as the other is raised, and the vertical rudder inclined towards the raised aileron. Defendants firmly deny that there is any turning tendency or swerving which requires turning the rudder away from its central position; and, giving effect to the language of the Circuit Court of Appeals in its opinion on the appeal to be relieved from the preliminary injunction, upon this point really hangs the question of infringement. Wright v. Curtiss, 180 Fed. 110, 103 C. C. A. 31.

Curtiss testified that he had given particular attention in flying to the ailerons of his machine, to acquaint himself with their movements, and to find out whether they caused a swerving of the machine on its vertical axis, which in its correction necessitated the use of the rear rudder, and he swears that the rear rudder is not used to assist the ailerons in their functions or to restore equilibrium, but merely for steering. The witness Willard, who has many times flown a Curtiss aëroplane, swears that in recovering balance there is no swerving or turning on the vertical axis, and that in effecting such maneuver the vertical rudder is held in a central position, and that he has never noticed any tendency of the machine to swerve because of the use of the ailerons, and in support of his testimony he cited an instance of the breakage of the controlling wires leading to the vertical rudder, and said that he flew ahead for a distance of two miles without its use; but as an equalizing device was used, and as the ailerons in the machine used were differently placed than midway between the planes, the incident loses importance. Captain Beck of the government aviation station, who has flown the defendants' aëroplane, substantially testified that there were no deviations of the aëroplane from its course, owing to the use of the ailerons, that the vertical rudder was not used to counteract any turning or swerving due to their use, and that he had never made such use of the vertical rudder; but he admitted that

on one occasion in climbing he tilted abnormally, and turned his rear rudder in the opposite direction to restore balance, and succeeded in doing so. Lieut. Ellyson, of the United States Navy, also testified that he noticed no swerving when flying, and that the vertical rudder in the Curtiss aëroplane is usually used in starting from the ground, but not in flying, except for steering purposes. The witness Post testified that from his observations in experimental tests he could testify positively that there is no turning of the machine around a vertical axis when the balancing planes are used, and that the rudder is used solely for steering.

The testimony of witnesses who have flown the defendants' aëroplane and swear that the rear rudder is not in fact used for recovering lateral balance, but that such function is performed solely by the ailerons, would ordinarily be entitled to greater weight than the opinions of experts, or the contradictory testimony of witnesses who were on the ground or in other flying machines, observing the movements of the defendants' machine, or than the statements made by others in relation to the manner in which such machine should be or had been operated, and would in this case, were it not that there is cogent evidence tending to modify or qualify their denials of the use of the vertical rudder except for steering. Willard concedes that the rear rudder is turned to the high side to gain additional restoring power, and that it is used as "a separate agent to accomplish a desired result more quickly or more positively." In the Curtiss letter in evidence it is substantially admitted that the rear rudder is turned toward the high side at times *to assist in balancing* the machine by steering or turning.

The testimony of Lieut. Milling of the United States Signal Corps aviation school, who has frequently flown in both Wright and Curtiss machines, strongly supports the claim that the defendants employ the vertical rudder for the dual purpose of steering and recovering balance under certain conditions. I quote therefrom concerning the method of flying the Curtiss machine. He says:

"I move the aileron on the low wing in order to increase the angle of lift, and move the vertical rudder toward the other side until the machine resumes a horizontal position," and move "the aileron on the other side in the opposite direction. * * * On two or three occasions, in very gusty weather, I have allowed the wing to remain in the position assumed when pressed down by a down trend of air, and have attempted to raise it by using only the ailerons. I held it in this position without touching the vertical rudder as long as I felt it to be safe, without any response. By moving the vertical rudder toward the high side, the machine resumed a horizontal position immediately."

This would seem to bear out the assertion that the rear rudder is used to correct the differences of resistance, and not merely to recover from an unusual tilt due to untoward causes. Although Lieut. Milling subsequently stated that under ideal weather conditions it is not necessary in the Curtiss machine to use the rear rudder in balancing, still, giving consideration to all the evidence, I am led to the conclusion that, notwithstanding the claim of the defendants that turning the rudder to the high side results in the performance of a different function

than in complainant's machine, the fact is clear that it does on occasion assist the ailerons in restoring equilibrium. That it is capable of action separately from the ailerons, or that it is turned to the high side only on extraordinary occasions, or that it is primarily for use in steering, and only incidentally to assist in restoring balance when abnormally tilted, does not avoid infringement.

The wheel by which the rudder is turned, and to which it is connected by wires, is positioned directly in front of the machine, and is adapted for movement practically at the same time with the ailerons, and thus the rear rudder and ailerons are capable of substantial coordination. It is true that none of the claims specifically state that the vertical rudder should be turned to the high side to recover the balance of the machine, or to keep it balanced, yet in claims 7, 14, and 15 means are included for moving it to the side of least resistance, which the evidence shows was the high side, the greater angle of incidence being the low side, as the pressure caused the machine to go faster on the high side, and necessitated counterbalancing, or checking such tendency. That the vertical rudder of defendants' machine at times operates on this principle is fairly substantiated. It is not unlikely that its ailerons produce a more effective result than do those of complainant's machine, and that the vertical rudder is not as often resorted to for maintaining or restoring balance; but nevertheless the evidence shows that there are times when the rudder is turned to the high side to prevent that side from flying faster than the opposite side, and by exerting an influence upon the ailerons assists them in their functions.

To further differentiate their machine from complainant's, the defendants assert that in their aëroplanes there is no normal difference in the angle of incidence to the course of travel as in complainant's, as their ailerons are directly in the "stream-line" and have no unequal pressures which tend to cause the machine to turn or swerve; and it is argued that the problem of the patentees was different from the problem solved by Curtiss, in that the machine of the former is steered by its wing tips and vertical rudder. while that of the latter is steered wholly by the rudder. But, as elsewhere shown, this argument is not entirely substantiated by the facts. It is true that in complainant's machine the vertical rudder is turned to the right when the course of the machine is to the left, while the Curtiss machine responds to the direction of its rudder. This difference, however, is not of controlling importance, and does not establish a patentable differentiation. With a knowledge of the principle of the patent in suit, and a familiarity with the method of operation of the marginal ends of the planes, it is not likely that there was much difficulty in making the supplementary planes of the defendants' machine in such a way as to avoid a difference in the normal angle of incidence by putting the planes in the "stream-line." Such alterations or modifications, however, in view of the latitude of the claims, did not constitute fundamentally different modes of operation from those described in the Wright specification.

The defendants are believed to have appropriated the substance of claim 7, and to have infringed claim 14, inasmuch as, in addition to the essential elements of the Wright patent and the object with which such elements are used, they also employ in their aëroplane, as hereinbefore shown, a horizontal rudder for "presenting its upper and under surfaces to the resistance of the atmosphere." ' Claim 15 contains the essential elements, and specifies the location of a vertical rudder at the rear of the machine and a horizontal rudder at the front thereof.

The defendants have embodied in their aëroplane the various elements of the claims in suit. While it is true, as pointed out herein, that the defendants have constructed their machine somewhat differently from complainant's, and do not at all times and on all occasions operate the same on the Wright principle, yet the changes they have made in their construction relate to the form only. They have constructed their machine so that it is capable of restoring equilibrium in substantially the same way as is complainant's machine, and the evidence is that on occasions, depending upon aërial conditions or other disturbing causes, they use the vertical rudder, not only to steer their machine, but to assist the ailerons in restoring balance.

It is unnecessary to further answer the arguments advanced at the bar bearing on the defense of noninfringement, as to do so would extend this opinion beyond reasonable length. Everything relating to the testimony and the criticisms thereon has not been fully treated, yet the material features have been sufficiently elaborated. The questions of law in the case are important; but the questions of fact are controlling, and in view of the novelty of the claims and their scope, the question of infringement is resolved adversely to the defendants as to the claims which are the subject of this controversy.

A decree may be entered, with costs, in favor of the Wright Company, as prayed in the bill; but, because of the importance of the litigation and of the questions involved, a supersedeas will be allowed, upon condition that an appeal be diligently prosecuted.