Booth, Chief Justice,
delivered the opinion of the court:
The plaintiff, Bobert Esnault-Pelterie, is a citizen and resident of France. At a comparatively early age he became a student and experimenter in the science of aeronautics, attaining high rank as an inventor and practitioner in the art of aviation. The United States Patent Office on November 3, 1914, granted to plaintiff Letters Patent #1115795 under circumstances to be referred to in detail later in this opinion.
Plaintiff in the petition charges the defendant with having infringed his patent rights, and specifically relies upon the validity of claims 2, 5, 6, 7, 8, and 9 of the letters patent to sustain the charge. The suit is brought under the act of June 25, 1910 (36 Stat. 851), as amended by the act of July 1, 1918 (40 Stat. 705), and section 155 of the Judicial Code.
In the first brief of defendant the jurisdiction of the court was challenged and a repetition of the defense was included in defendant’s second brief. The defense was not pressed in oral argument and, as we understand it, was finally abandoned. At any rate, finding II with respect to this issue is amply supported by the record, and Ave have no doubt as to our jurisdiction under section 155 of the Judicial Code.
The defense to the suit is predicated upon three grounds: First, the invalidity of the patent because anticipated by the prior art and lack of novelty; second, the claims are not supported by the disclosure; and, third, the claims should be restricted to the precise devices described, and defendant did not use or cause to be manufactured any airplanes embodying this precise mechanism.
Plaintiff’s patent is for what is known in the art as the “ joy stick ”, a single vertical lever so connected with the equilibrium controlling organs of an airplane as to enable the pilot thereof to cause the same to' assume any required attitude in flight. The novelty of the invention and detail of its construction, as well as operativeness, we will discuss later in this opinion.
The solution of the present controversy, despite familiarity with same, involves a repetition of the principles of flight, and at this point it is essential to state and keep in *829 mind that we are dealing with an art at a time when it was in an initiatory, formative state. The possibility of flying a heavier-than-air machine had but recently been demonstrated, i. e., a plane propelled by motive power and carrying a passenger or passengers when the plaintiff’s inventions were applied for, and the various devices and mechanisms developed to control the stabilizing organs of the plane in flight, indisputably demonstate that the necessity therefor was imperative, and existing ones, to say the least, not satisfactory.
It is a scientific fact that it is the reaction of the air upon the wing surfaces of a plane that supports the same in the air through which it travels. To secure this reaction in the type of machine involved, a propeller and a motor are employed. A minimum of maintained speed is indispensable to flights. Two types of control are involved m the piloting of a plane, i. e., directional and equilibrium control. Directional control is effected by the functioning of a vertically hinged control surface located generally in the rear of the fuselage, a control surface which corresponds to a rudder on a ship and is operated by the pilot to direct the course of the plane and correct yawing if the same should occur. The steering of an airplane in normal flight is not usually a critical control. “It is”, as finding X states, “immaterial whether the machine flies toward one point of the compass or another so far as its safety is concerned.”
Equilibrium or attitude control, on the other hand, involves two vital and important factors, i. e., longitudinal equilibrium control and lateral equilibrium control. Longitudinal equilibrium control is effected by the functioning of what is known in the art as an “elevator”, which is in fact a horizontally hinged rudder located at the rear of the fuselage, capable of being moved upward or downward by the pilot, thus varying the angle of attack of its surface, thus lowering or raising the rear of the aeroplane, and enabling the pilot to either ascend or descend as his flying course exacts.
Lateral equilibrium control is effected by what may be fundamentally termed “wing distortion.” Originally, in *830 order to accomplish this, a portion of the outer end of each wing surface was constructed to yield to a warping force whereby one such surface was inclined upward and the opposite downward, producing a resultant decreased lift on one surface and an increased lift on the opposite one, thus causing the plane to roll about its longitudinal axis.
Maintenance of lateral equilibrium is a factor of extremely vital importance to safety in flight. Unequal air currents, air pockets, and tumultuous atmosphere, all invisible to the pilot and constantly to be anticipated, very frequently disturb the lateral equilibrium of an airplane, and it is of very great importance that this temporary loss of equilibrium bo immediately regained.
The original process of wing warping has been generally if not universally superseded by ailerons, which are conced-edly direct mechanical equivalents for wing warping. (See Wright Co. v. Herring-Curtiss Co., 204 Fed. 597, 607, 608, later sustained by the Circuit Court of Appeals, second circuit. See 211 Fed. 654.) Ailerons are standardized portions of the outer rear wing surfaces, hinged in place and capable of movement so as to distort or alter the contour or form of a portion of the wing surfaces and thus obtain precisely the same air reactions obtained by wing warping. Their presence neither increases nor diminishes the total wing surface, and they are operated by the poilot for lateral equilibrium control.
A rolling movement or change of attitude from horizontal flight is incidental whenever the pilot wishes to turn the plane to the right or left. The turning of a plane is effected by means of its rudder, and to avoid sharp turns calculated to produce skidding, or, as stated in evidence, “ side-slips ”, banking is resorted to, i. e., a more or less gradual inclination of the plane designed to overcome any centrifugal force brought into play by the turning movement, and the so-called “ banking movement ” is effected by the pilot operating the organs of lateral equilibrium control, the ailerons. The differential drag of the wings of a plane, manifest when the plane is banked or subjected to the rolling movement, develops a deviation from its directional course, i. e., “ a *831 yaw ”, the degree of which is dependent upon the angle of the roll and “ upon the character of structure employed for altering the wing surfaces.”
The uncertainty of atmospheric conditions and their contrariety of movement in a majority of the time during flight induce simultaneously a disturbance of both longitudinal and lateral equilibrium, and to correct the same “ it is necessary that the airplane shall be tilted in an oblique vertical plane lying between the longitudinal and transverse planes of equilibrium or attitude control.” In other words, the pilot may not resort to á sole banking movement as in effecting a turn but must simultaneously incline or tilt the plane at such an oblique angle as will restore the same to normal equilibrium. The frequency of disturbed air conditions and the various angles of resistance involved therein render it necessary to meet this complicated control condition in the majority of instances of attitude control.
While turbulent air conditions may be met at any altitude, it is not disputed that a disturbed condition of the air generally prevails until an altitude of two or three thousand feet is reached, and due to this precarious condition present at landing and taking off it is most essential to provide simple means for controlling the equilibrium and proper attitude of the plane. The crucial problem in the very beginning of designing airplanes for flight was as the Wright brothers said in 1908, “ exactly what we knew it must be — the question of equilibrium.”
The utility of ailerons to control lateral equilibrium; of elevators to accomplish ascent and descent; of a rudder to effect directional control; of a stabilizing surface near the rear of the fuselage to aid horizontal equilibrium of the plane, as well as dihedral wing surfaces, was old in the art. The problem facing aviators during the period of time involved herein was the creation of an appropriate and effective means for manually controlling the above stabilizing organs of the plane, a means which would enable the pilot, to easily and with a minimum of mental effort effect the maneuvers incident to flight, add materially to .its safety, and simplify operativeness.
*832 Prior to a detailed discussion of the patent in suit, it is necessary to consider three related French patents issued to Esnault-Pelterie, plaintiff, based upon applications filed in France prior to the filing of the United States application which matured into the patent in suit.
These French patents are tabulated herewith in the order of their date of issuance, and for the sake of brevity will be hereafter referred to as the Esnault-Pelterie French patents numbers 1, 2, and 3, respectively.
Number 1: French patent to Esnault-Pelterie, #372753, •entitled “An airplane with two pairs of movable wings ”, applied for December 19, 1906; granted February 28, 1907.
Number 2: French patent to Esnault-Pelterie, #373763, entitled “An airplane with deformable wings to give it equilibrium and with stabilizing and elevating rudders ”, applied for January 19, 1907; granted March 28, 1907.
Number 3: French patent to Esnault-Pelterie, #373818, entitled “Airplane ”, applied for January 22, 1907; granted March 28, 1907.
Number 1: Ebench Patent to Esnault-Peltebie, #372753
The disclosure of French patent number 1 relates to an airplane having two pairs of wings arranged in tandem. Each pair of wings is supported upon shafts which are rotatable in the fuselage so that the angle of the attack of the wing surfaces with respect to the air may be altered. The shaft connecting the front pair of wings is solid so that the angle of attack of the two wing surfaces of either side of the fuselage is always the same. The rear pair of wings is mounted upon separate shafts, thus enabling the rear wings on each side of the fuselage to be adjusted to different angles of attack under certain conditions.
A rudder movable about a vertical axis is mounted at the rear of the fuselage adjacent the rear pair of wings, this rudder functioning to give directional control.
The rotatable wings function to impart longitudinal and lateral equilibrium control to the airplane and as the mechanism which imparts the controlling movement to these wings and rudder is somewhat of a complicated nature, and *833 requires detailed consideration, fig. 4 of this French patent is illustrated here in order to more clearly disclose its operation.

The basic elements of this controlling system comprise two horizontal levers, 22 and 23, respectively, each universally mounted with respect to a horizontal shaft 9. Horizontal levers 22 and 23 are so mounted that the outer ends or right-hand ends of these levers, as shown in the above figure, are adapted to be grasped by the right and left hands of the pilot, respectively. The inner end of these levers extends beyond the shaft 9 and is interconnected by a cross member 20 which is fastened to the right-hand lever 22 by means of a ball and socket joint, and to the left-hand lever by means of a slot or sliding connection.
The cross member 20 is connected at its middle point with a horizontal part 19 of a right-angle lever also pivoted on shaft 9, the vertical portion of which 14 carries at its top a crossbar 16 connected by linkages 17, 17, to levers 18, 18, connected to the respective shafts e, e, of the rear wings f, f. The right-hand lever carries a downward extension arm 10 *834 connected by a link 11 to a horizontal cross member 12 carried on a vertical arm 13 connected to the shaft d, upon which the front wings c, c, are mounted. The left-hand lever carries an upwardly projecting member 10 connected by a similar link 11 to the left-hand end of the cross member 12. The left-hand lever 23 is connected by a flexible cable 27 to the aforementioned vertical or directional rudder not shown in this particular figure.
By virtue of the universal mounting of horizontal control levers 22 and 23 on the shaft 9, the pilot can impart to each of these levers either a horizontal or vertical movement, or a movement in an oblique direction which possesses both vertical and horizontal components. A horizontal movement of the handle end of lever 22 or the horizontal component of an oblique movement of this lever imparts a sidewise movement to the cross-connecting member 20 which through the member 19 imparts a rotative movement to the vertical portion 14 of the L-shaped member 19, 14; such movement imparts a rotation to the crossbar 16 which in turn through the links 17 imparts a differential movement to the rear wings e, e, causing one of these wings to increase its angle of attack and the other to decrease its angle of attack. Such horizontal movement or horizontal component of movement of the right-hand lever 22 thus effects the lateral equilibrium control of the airplane in a direction causing the airplane to l’oll in the direction in which the horizontal lever 22 is pushed.
The longitudinal equilibrium control of the machine is described as being effected by raising or lowering the handle end of the right-hand lever 26; such control, however, is complicated by the fact that the right and left-hand levers are interconnected by the cross member 20 in such manner that the inner ends of each lever form, a fulcrum point upon which cross member 20 pivots. Such longitudinal equilibrium control, as is described, can, therefore, only be effected by movement of the right-hand lever in a vertical *835 plane at a time when the left-hand lever is held in a fixed position by the left hand of the pilot. Any movement of the left-hand lever in a vertical plane will act to shift thei fulcrum point and move the front wings in a contrary direction and thus cause a variation in the amount or degree of equilibrium control applied to the plane by movement of the right-hand lever through a given distance.
This variable effect of relative vertical movement of the right and left-hand levers is further complicated by the fact that the right-hand lever is connected to the pair of front wings by a downwardly projecting member 10 and link 11 whereas the left-hand lever is connected to the front wings by means of an upwardly projecting member 10 and link 11. Any vertical movement of levers 22 and 28 therefore exerts a contrary or opposite longitudinal equilibrium controlling effect.
This patent therefore discloses “ a two stick ” longitudinal equilibrium control in which the pilot must manipulate two horizontal interconnected sticks and must continuously maintain his hold upon both of the said levers, and in order to obtain longitudinal equilibrium control by a vertical movement or vertical component movement of the right-hand lever he must, at the same time, maintain the left-hand lever stationary and in a predetermined position.
Number 2: French Patent to Esnauet-Pelterie, #373763
The structure herein disclosed comprises an airplane of the monoplane or wing wind type in which the wings are deformable or distortable in order to obtain lateral equilibrium control. A pair of vertical and horizontal rudders is mounted on a wing member at the rear of the fuselage, the vertical rudders giving directional control and the horizontal rudders giving longitudinal equilibrium control. The ring is so mounted that the vertical rudders may be deflected in a substantial vertical plane, and the horizontal rudders may be deflected substantially in a horizontal plane.
*836 The mechanism effecting the control of the plane, as illustrated in fig. 6 of this French patent, is illustrated here.

The vertical lever 8 is connected by a link 9 to a lateral point of the link carrying the rudders. Movement of the lever 8, fore and aft, moves the ring in such a manner as to cause the directional rudders to function. The vertical lever 1 which is on the right hand of the pilot seat, is mounted on a ball-and-socket joint. Inclination of this lever to the right will cause a pull in a forward direction on link 4 rotating a cross member h in such a direction as to cause a pull on the left-hand bracing wire g connected to the relative portion of the left-hand wing and at the same time releasing the tension on the bracing wire g going to the rear of the right-hand wing. Reversed conditions apply to the bracing *837 wires /, f, so that an inclination of the vertical lever 1 toward the right will cause the plane to roll to the right, and vice versa.
A forward movement of the vertical lever 1 causes a pull on the link or rod 6 which is connected to the bottom of the ring; therefore, the forward motion of lever 1 pulls the bottom of the ring forward and moves the horizontal rudders in such a direction as to cause a nosing down of the airplane. Moving the lever 1 in the opposite direction or back will cause the plane to nose up. The French patent, also refers to the advantages due to the fact that the lever 1 may be movable in an oblique direction and, therefore, simultaneously introduce transverse and longitudinal equilibrium control.
As disclosed in this French patent, each of the vertical levers thus had a separate and independent function, the left-hand lever being utilized for directional control of the plane and the right-hand lever being utilized to maintain both lateral and longitudinal equilibrium control. The directional equilibrium response of the plane follows and is. in accord with the angular displacement of the right-hand lever.
Number 3: French Patent to Esnault-Pe¡lterie, #373818
This patent discloses an airplane of the monoplane type quite similar to that disclosed in the Esnault-Pelterie French patent number two; the only substantial difference is in the construction of the tail. Instead of having separate vertical and horizontal surfaces for directional control and longitudinal equilibrium control, respectively, the disclosed construction has a single surface which is mounted on a normally horizontal axis. This surface is capable of movement on this horizontal axis so as to increase or decrease the lifting effect of this tail surface, thereby controlling the inclination or attitude of the plane on its longitudinal axis. This tail surface may also be rotated about the longitudinal axis of the plane, thereby causing the rear of the plane to yaw to one side or the other, thereby introducing a directional control.
*838 As disclosed in fig. 4 of this French patent, reproduced on the next page, the left-hand lever x by its movement from side to side rotates the bar y and through the universal joints w, w rotates the rear control surface about the longitudinal axes of the plane for directional control. The right-hand vertical lever 5' is universally mounted at its lower end and by manipulation from side to side effects lateral equilibrium control in the same manner and in the same direction as described in connection with the previous French patent number two. Movement of the lever 5 in a forward direction pulls on the wire 4 and link 2, which is connected with a dependent horn 1, thus giving the rear control surface a greater angle of attack and causing the plane to nose down, a reverse or backward motion of lever 5 causing the airplane to nose up, the directional response of the airplane therefore being in accord with the inclination of the universally mounted vertical lever 5.
As more fully set forth in finding VI, plaintiff actually constructed and operated an airplane of the type disclosed in this French patent. This machine is now a part of the collection in the Conservatoire des Arts et Metiers in Paris.
Plaintiff at first executed an application for United States letters patent based on all three of his French patents discussed supra. This application, however, reached this country too late for filing within the statutory time limit with respect to the first French patent. Plaintiff then executed a second application for United States letters patent basing the same on his French patents numbers two and three and omitting reference in the oath to his first French patent. This is the application which matured into the patent in suit. As the facts relating to the filing of these applications are fully set forth in finding VII, it is unnecessary to reiterate them here. It is sufficient to add that from consideration of the file wrapper of the United States application, which matured into the patent in suit,, it is apparent that the same is directed to the same invention and monopoly disclosed in the second and third French patents, and, therefore, under the second paragraph of section 4887, Patent Statutes, which relates to priority by treaty, the fil *839 ing date of the patent in suit, which so far as the invention is expressed by the claims in suit relates back to January 19, 1907, and January 22, 1907, respectively, the filing dates of

the Esnault-Pelterie French patents numbers two and three which disclosed to those skilled in the art the arrangement and operation of the control elements which we have specified in our consideration of these patents in suit.
We quote herewith this pertinent portion of section 4887, title LX:
“An application for patent for an invention or discovery or for a design filed in this country by any person who has previously regularly filed an application for a patent for the same invention, discovery, or design in a foreign country which, by treaty, convention, or law, affords similar privilege *840 to citizens of the United States shall have same effect as the same application would have if filed in this country on the date on which the application for patent, for the same invention, discovery, or design was first filed in such foreign country, provided the application in this country is filed within twelve months in cases within the provisions of section forty-eight hundred and eighty-six of the Revised Statutes. * * *”
As the plaintiff’s first French patent was not issued until February 28, 1907, and was not published until April 18» 1907, this patent cannot be considered as prior art. At this point, however, we will also refer to the first paragraph of section 4887, which states:
“No person otherwise entitled thereto shall be debarred from receiving a patent for his invention or discovery * * *, unless the application for said foreign patent was filed more than twelve months * * * prior to the filing of the apjolication in this country, in which case no patent shall be granted in this country.”
Because of this section of the statutes it would be impossible for plaintiff to obtain a monopoly under the United States patent for the saane invention disclosed in its first French patent but the statute does not preclude him from obtaining a monopoty by virtue of the United States patent for an invention which differs from or is a patentable improvement upon the structure disclosed in its first patent.
We will discuss the question of the effect of the first French patent more completely after we have given consideration to the patent in suit.
The Patent in Suit
The patent application, which matured into the patent in suit, was filed in the United States Patent Office on Jan-il ary 16, 1908, and was, as already indicated, based upon the two embodiments disclosed, respectively, in the plaintiff’s French patents numbers two and three. The drawings as filed in the application contained figures 6 and 4 of plaintiff’s French patents numbers two and three, heretofore illustrated.
The Patent Office’s first action required the applicant to supply new drawings which should set forth the mechanism *841 greater In response to this request plaintiff filed new drawings on February 1, 1909, which included figures 6 and 10 illustrating specifically the control mechanism which we reproduce on this page for the purpose of illustration.
With reference to these figures the specifications of the patent state in part as follows:
ITSTIRE 6
“The distorting of the wings and the control of the inclination of the rudders can be performed in the following manner: To a -vertical lever 61 mounted on a ball and socket and located, for example, on the right hand of the pilot, is

connected, on the one hand, through an arm 62, an angle, lever 63, a horizontal bar 64 which is hinged to the end of a horizontal arm 65 keyed at right angles on the vertical rod 55 operating the stay-wires. On the other hand the said lever 61 is connected through a rod 66 hinged thereto', to an attachment 67 on the lower end of the ring 58 (Figs. 4 and 5). It will now be seen that by moving the lever, either *842 to the right or to the left, the rod 55 is system of transmission, to rotate and thereby the wings are distorted, thus controlling the transverse stability. Moreover, by moving the said lever 61, forward or backward, the rod 66 will be pulled or pushed, and the rotation about an imaginary horizontal axis, that is, the forward or backward inclination of the ascensional rudder 60, will be obtained. Furthermore, by moving the said lever 61 in a direction intermediate the right or left and the front or back, the rod 55 and the rod 66 will be simultaneously affected, that is, the means for controlling the transverse stability and the means for controlling the longitudinal stability will be simultaneously actuated.
“Another lever 68, symmetrically arranged with the lever 61 as regards the pilot seat, is again connected through the rod 69, to a lateral point 70 of the ring 58; thus by moving it fore or aft, the rotation about an imaginary vertical axis of the ring 58 and consequently of the directing rudder 57 will be effected.”
HfiDBB 7
“At the rear part of the covering 9 is the double-hinged rudder 71 formed with a horizontal plane or concave surface. The said rudder is so mounted that it can be turned about its longitudinal horizontal axis 72 which, for example, may be hollow and may engage a cylindrical fixed bar 73 used as a holder. To this bar 73 is connected an axis 74 (fig. 10) mounted in a bearing 75 and fixed to the first fork 76 of a Cardan joint, the second fork 77 of which is connected, through a bar 78, to a second Cardan joint 79 which is itself connected to a vertical lever 80, through a longitudinal and horizontal bar 81. On the other hand, the hollow axis 72 of the rudder is secured to a vertical rod 82, connected through a rod 83 hinged to a small vertical arm 84, to a longitudinal bar 85 ending in another lever 86 placed symmetrically with the lever 80 with reference to the pilot’s seat 28. On the one hand, it will be possible with the lever 80 which is moved either to the right or to the left, to cause the bar 81 and with it the bar 78 of the axis 74, to turn and thus to turn the rudder 71 about the said axis 74, and consequently to lower one side and raise the other. Such working has the effect of generating a horizontal power which causes the machine to turn and permits of steering horizontally. This is the way the birds and particularly the seagulls use their tails when they desire to turn. On the other hand, by moving the lever 86 forward or aft the rudder is caused to move about its axis 72, so as to lower or raise its front part. This is the way by which the longi *843 tudinal stability of the aeroplane will be controlled and the ascent or descent of the latter will be obtained. Moreover the lever 86 is connected through a horizontal bar 87, to an angle lever 88, and a longitudinal bar 89' hinged to the said lever, with an arm 90 perpendicular to the rod 55, which, in turn is secured to the bar 54. When moved either to the right or to the left the lever 86, which is mounted on a ball and socket at its lower end, will cause the rod 55 and thereby the transverse bar 54 to turn, which will have the effect of distorting the front pair of wings.
“ The lever 86 is, furthermore, adapted to simultaneously actuate the rod 55 and the rod 85 in a manner similar to that described above in relation to the lever 61, fig. 6.”
The facts relating to the disclosure of the patent in suit, and the details of the embodiments thereof, are specifically set forth in our findings XIII, XIY, and XV. We have, however, inserted the above illustrations and have quoted from certain portions of the patent, which we believe establish an entirely satisfactory basis of disclosure for the claims in suit. The “single vertical lever movable in every direction for controlling”, shown in detail in both illustrations and described in the specification, and its connections are so illustrated and described that its direction of movement to produce a given response in the equilibrium control of the airplane is instinctive in character.
There is considerable contradictory testimony in the record by the various experts for both the plaintiff and defendant on the question of instinctive control. Defendant’s experts urge that there is no virtue in having the equilibrium control lever or “ joy stick ” so connected to the control surface that instinctiveness plays a part in the manipulation of this lever by the pilot. The defendant in its brief urges that the operation of the joy stick is a matter of acquired habit. We agree with this latter statement with the qualification, however, that any given habit is easier to acquire if it is instinctive rather than contra-instinctive.
There is no doubt that every human being automatically attempts to maintain his balance or equilibrium at all times and if moved off balance in any direction instinctively effects an opposite mental and muscular response to restore his body to a normal vertical position. This is fundamental knowl *844 edge and it is unnecessary to amplify it further, other than to observe that this automatic or instinctive balancing action is well apparent to anyone who has walked the deck of a steamship while it is rolling and pitching.
This balancing instinct is made use of in the universally pivoted vertical control lever or the joy stick control of the patent in suit in the manner illustrated by the figure reproduced here.
The full lines of the figure are illustrative of a pilot in level flight. If, due to disturbed air conditions, the plane is caused to nose up or down, the pilot’s body, due to his balancing instinct, will tend automatically to assume either

the forward or rearward dotted line position, respectively, and his mental instincts will thus tend to cause him to push forward or pull backward on the joy stick, which in each case will so operate the controlling surfaces in a proper direction to restore the airplane to its previous level attitude. The same instinctive reaction will also take place when the plane rolls from side to side or assumes a position in which both longitudinal equilibrium and lateral equilibrium are disturbed. If the pilot desires to initiate a departure from level flight, the banking of an airplane when making a turn being an example of this, he has the natural instinct to lean or incline his body just as a motorcyclist does and here again the directional response is in accord with the pilot’s instincts. The directional response is thus always in the proper direc *845 tion with a minimum of mental effort on the part of the pilot.
In certain abnormal conditions, such as when an airplane is in a spinning nose dive or is flying in fog or through clouds, the pilot cannot trust to his balancing instinct. The fact that the suppression of the natural balancing instinct necessitates special training in order that the pilot may be able to successfully meet these abnormal flying conditions, in our opinion emphasizes the use of the balancing instinct in normal flight conditions. (See finding XII.)
Brigadier General B. D. Foulois, a witness for defendant, who was at that time assistant chief of the Army Air Corps, had been connected with aviation since 1908, and had flown many types of planes, testified with reference to the joystick control as follows:
“* * * i would say that the control that we are using today, as compared to the controls that we have used in the past, is much less complicated, much easier to learn, much easier to handle, and easier tq operate and control your airplane in connection with all the other various pieces of equipment and instruments that you have to handle in the plane.
“41. Q. Does your statement apply to the Dep control as well as to the stick control?
“A. I would say that the present stick control is the most satisfactory control we have ever had from the standpoint of training, from the standpoint of operating your airplane, and from the standpoint of minimum amount of attention which may be required to operate all the other various pieces of equipment that you have in a plane to take care of.”
It is true that the operation of the equilibrium-control lever in a direction responding to reflex or instinct, while specifically included in claim Y, is not discussed in detail in the specification. While the specification does not specifically make any reference to its advantages, they are, nevertheless, present and inherent in the detailed disclosure to which we have referred, and anyone practicing the teachings of this patent by the utilization of its disclosure will realize the benefits of this instinctiveness which are inherent in the structure disclosed. Moreover, anyone reading the patent would not neglect to read the claims and study the patent in its entirety.
*846 It would be contrary to established precedents to hold that an omission from the specification of a discussion of the fact that the control is instinctive in direction, invalidates the patent, when such instinctive directional movement is inherent in the operation of the mechanism found in the detailed disclosure of the patent. (See Wezel & Naumann Aktiengesellschaft v. Morgan Lithograph Co., 54 Fed. (2d) 235, 231). In this case the court said:
“It would certainly seem contrary to justice to hold that this inadvertent omission which every one would unconsciously supply, and which could not possibly interfere with the practice of the art, should nevertheless deprive the pat-entee of the reward of his efforts. I think that would be carrying the technicality of the patent law too far.”
One reading the specifications of the patent and studying its operation, and assuredly one operating the described mechanism, could not, if skilled in the art, escape knowledge of the fact that instinctive directional movement was a factor inseparably present in the form of construction specified. 3t does not exact elaboration to demonstrate to those skilled in aviation the scientific facts attendant upon resuming equilibrium when the same is disturbed either in the air or upon the ground. If the mechanism responds in operation to all human instinctive movements to restore equilibrium, and the disclosure exhibits this fact by specifying its operation, this we think meets all the requirements of the patent law.

In making this statement we are cognizant of the fact that in fig. la of the Esnault-Pelterie patent in suit, illustrated above, and which is not specifically described in the speci *847 fication, the rudder horn 82 is reversed from the other figures and is mounted on the upper side of the tail surface of the airplane 71. In this figure, which formed no part of the original disclosure, the horn is connected to the vertical control lever 86 by means of a control wire or very thin rod 83. As the tail surface of the airplane has a lifting effect and has a downwardly curved contour for this purpose, it does not take a high degree of mechanical knowledge or skill to see that such a construction is inoperative in that the wire or rod 83 will bend or buckle by application of the lifting force on the tail surface 71 which is hinged at 73. There has been testimony in the case that points to the fact that this inoperative construction is due to a draft-man’s error.
Whatever the origin of this contradictory figure, however, its effect on the disclosure of the patent as a whole, to those skilled in the art, appears to be nil.
Mr. Roche, senior aeronautical engineer for the Materiel Division of the Air Corps at Wright Field, who testified as an expert in this case on behalf of defendant, after referring to the inconsistent disclosure of fig. la, was questioned as follows:
“ State what kind of a structure you would produce in view of the specifications, the figures and the inconsistencies which you have considered, referring to the birdtail only and its control and assembly.” He answered:
“ I would construct something very much the same as the installation on the ‘Vought’ airplane tested at Langley Field * *
The structure tested on the Vought airplane comprised a tail surface with the tail control rod connected to an cmn or horn underneath the tail surface, as disclosed in fig. 10 of the patent in suit, and with the movement of the control stick in an instinctive direction. This opinion of the defendant’s expert seems clearly to indicate what the man skilled in the art would construct from the teachings of the patent in suit.
If those skilled in the art, in constructing the mechanism from the information furnished by a patent, would naturally construct it so that it would possess a certain capability *848 and mode of operation, that capability and mode operation must be inherent in the disclosure and a characteristic of the invention expressed in the patent.
Such an evident mistake in this figure of the drawings should not render the patent invalid. (See Van Meter v. Irving Air Chute Co., 27 Fed. (2d) 170, 173.) In the Van Meter ease the patentee was suing the United States under a special jurisdictional act for infringement of what he specified a “parachute apparatus or aviatory life buoy.” Fig. 12 of the patent drawings disclosed constructive features, and, as the court observed, it “would be hazardous for the wearer to pull the cord of the parachute in question for throwing aside the casing and opening the chute while he continued in his seat ” (p. 173). The court in the opinion said:
“ This was evidently a misconception of the draftsman of the sketch. The patent is not invalid, or the claim limited to the illustration, because of this mistake or lack of understanding. See Temple Pump Co. v. Goss Pump Co., 58 Fed. 204.”
The illustrated detail of construction pointed out by defendant’s counsel is, we think, so obviously an error that anyone skilled in the art would at once discover it. Assuredly it is not of such consequence as to indicate a lack of apprehension on the part of the patentee as to the precise character of the mechanism he conceived and its operativeness. This obvious error was not carried into the specifications, and in all proceedings relative to the plaintiff’s patent application, played no part. Under this state of facts it is evident in our opinion that lack of utility in plaintiff’s mechanism may not be predicated upon such a mistake in patent drawings.
Defendant contends that there has been an illegal expansion of the original invention into the monopoly as expressed by the present claims in suit. This is based upon the argument that the plaintiff did not insert claims directed to the vertical stick control until 1913 although his application was filed in 1908, and during the intervening period the device had come into general use in the United States. The contention is based upon the premise that there is a lack *849 of equity in permitting an applicant to continue an application in the Patent Office indefinitely and to present claims directed to previously unclaimed subject-matter years after its filing date and after competitors have established actual manufacture or use.
Such doctrine obviously constitutes an exception to the long-recognized right of a patentee to claim subject-matter disclosed by him at any time so long as his patent is not yet issued.
The file wrapper and contents of plaintiff’s patent disclose the proceedings in the Patent Office with respect to plaintiff’s application and issue. Patent Office proceedings and patentee’s responses to the same with respect to laches on the part of the latter are fixed by statute. In this case the limitation placed by law within which plaintiff must respond to action upon the part of the Patent Office was one year, and the record does not establish that plaintiff ever exceeded this period of time in responding. The Supreme Court in the case of Overland Co. v. Packard Co., 274 U. S. 417, in an exhaustive opinion involving this precise issue, decided that patent rights were conferred by statutes, and when a patentee complied with statutory provisions as to time limitations within which to proceed to obtain an issue, laches could not be imputed to him, even if he availed himself of every single day of the time allowed. The doctrine of equitable estoppel is not available to defeat patent rights if the record establishes conformity with the patent laws. In deciding this issue the court said (page 423):
“Counsel for the alleged infringer says, that even with the time limit for action on the part of the applicant thus reduced to one year, it becomes easily possible for an applicant, after an action by the Patent Office upon his application, to delay for the full period of a year his response to such action, and however promptly the Patent Office may again act, he can delay another full year before replying to it, and thus, by waiting a year after each official action, (1) keep his application pending so’ as to enable him to withhold, indefinitely, his invention from the public, (2) add claims to his application covering the independent intervening developments of others, and (3) postpone the time when the public may enjoy the free use of the invention — all contrary to sound public policy.
*850 “ The answer to this argument is that the matter entirely within the control oí Congress, and, in order to avoid the evil suggested, Congress may reduce the time within which one who is seeking an adjustment with the Patent Office, in order to obtain a patent, shall act upon receipt of notice of a decision of the Patent Office, in the course of the application through that office. Congress, as we have seen by the history of the statute, reduced this time for an indefinite period in 1861 to two years in 1870, and to one year in 1897, and as provided in the last Congress, to six months. Act of March 2,1927, c. 273, 44 Stat. 1335 ”—
and again, on page 425, used the following language:
“A party seeking a right under the patent statutes may avail himself of all their provisions, and the courts may not deny him the benefit of a single one. These are questions not of natural but of purely statutory right. Congress, instead of fixing seventeen, had the power to fix thirty years as the life of a patent. No court can disregard any statutory provisions in respect to these matters on the ground that in its judgment they are unwise or prejudicial to the interests of the public.”
In addition, it is evident and the findings show that plaintiff from the filing of the application to its date of issuance has continuously directed claims to the equilibrium control.
When the application was filed it included claims in the following phraseology:
“ 4. An aeroplane in which the controlling is effected by two separate levers, rigid transmissions for controlling the distortable wings and both rudders.”
íj; sfc %
“ 6. An aeroplane in which the controlling methods of the rear tail forming the rudder is carried into effect by means of two levers symmetrically arranged with reference to the pilot seat, the left-hand lever, for example, causing through a cardan system, the rotation of the rudder about a longitudinal horizontal axis, and the moving of the right-hand lever causing the inclination thereof about a transverse horizontal axis.”
Interpreting claim 4 by referring to the specifications and drawings as originally filed, it is apparent that it covered lateral and longitudinal equilibrium control.
In its action of March 10, 1908, the Patent Office objected to the specification and all of the claims, and the patentee *851 responded to this action by filing a revised specification, cancelling the claims as filed and substituting new claims therefor, this amendment being received in the Patent Office February 1, 1909, which was within the statutory period of one year allowed for response. Included in this amendment were two claims, as follows:
“ 2. An aeroplane having distortable wings for maintaining transverse stability, a rudder for maintaining longitudinal stability, a lever controlling said wings and said rudder, a steeling rudder, and a separate lever controlling said steering rudder.”
“ 18. An aeroplane having means for controlling its inclination and a single lever for operating said means to control both the longitudinal and the transverse stability of the apparatus, said lever being arranged to oscillate in different vertical planes, means for transmitting its movement in one plane to the means for governing the longitudinal inclination, and means • for transmitting its movement in the other plane to the means for determining the transverse stability, said lever being mounted to permit also an oblique movement having components in each of said planes so as to actuate simultaneously the means for establishing longitudinal stability and that for establishing transverse stability.”
Claim 2 remained continuously in the case during the entire Patent Office proceedings, was allowed by it as claim 2 of the patent in suit, and is now one of the claims in issue. While the patentee, during the prosecution of his application, may have at various times inserted more narrow claims specifying in a more detailed and more limited form the connections of the control lever, its arrangement with respect to the controlling surfaces, and the direction of response, the insertion of progressively narrower claims is but the usual method of prosecuting an application in the Patent Office and does not indicate an abandonment by the patentee in his attempt to obtain a patent monopoly on the equilibrium control.
Claim 13 to which we have referred, supra, and which includes the “single lever” for operating the equilibrium controls “said lever being arranged to oscillate in different vertical planes”, and thus being directed to the universally mounted vertical lever, was canceled as the result of a Patent Office rejection on May 23, 1912.
*852 On June 12, 1913, the patentee filed a new set claims among which were claims 5, 6, 7, and 8 of the patent in suit, which claims are now in issue. The fact that from May 23, 1912, to June 12, 1913, or for a period of slightly over a year, there was not pending in the Patent Office a claim of the character as exemplified by claim 13 quoted above, is witíiout import as at no time was there any abandonment of the broad .monopoly as expressed by claim 2.
However, viewing this matter entirely aside from claim 2 and the continuity of the broad monopoly covered thereby, there was a lapse of but approximately thirteen months between the cancellation of claim 13 and the renewal of claims for substantially the same subject matter before the Patent Office. Such period is well within the two-year period rule defined by the Supreme Court in Chapman v. Wintroath, 252 U. S. 126, and Webster Co. v. Splitdorf Co., 264 U. S. 463, in which latter case the rale is applied to claims inserted in divisional cases, where there has been a disclosure to the public by the issuance of the parent application.
In the case at bar there could be no assumption of abandonment of any right to the public during this lapse of thirteen months, for during this period the application was pending in secrecy in the Patent Office* and the public was given no disclosure such as exists in the case of a reissue or a patent subsequently issued on a divisional application. (See Diamond Power Specialty Corp. v. Bayer Co., 13 Fed. (2d) 337, 339.)
Such cancellation of claim 13 and the subsequent renewal of substantially the same subject-matter occurred while the contract between the inventor and the public was in a formative state in the Patent Office. As it now appears, the rejection of claim 13 and its cancellation was a mistake which the Patent Office later rectified when it allowed substantially similar claims. But mistake or not, this action by applicant was subject to reconsideration as long as the Patent Office would grant such a review.
For the reasons just outlined, and particularly in the absence of a disclosure to the public by the inventor, we fail *853 to see how a defense of intervening rights can be established.
Aside from this consideration, however, the facts in the case at bar do not warrant any defense of intervening rights. As stated in detail in findings XXXVIII and XXXIX, the planes in public use in the United States in 1912 made use of the Wright and Curtiss types of control which were essentially different from the “joy stick” control of the patent in suit, and there is no evidence that any airplane was in existence in the United States at any time when the Esnault-Pelterie application did not contain either claim 13 or the later substituted claims.
The defendant in written argument contends “that in every branch of mechanics, control levers are invariably positioned where dictated by convenience, expedience, ease of control, and available space conditions ”, and asserts that “ the disposition of any lever is universally recognized as a matter only of mechanical skill or expediency representing the mere selection of the designer.”
If the plaintiff’s patent alleged to have been infringed, and the claims involved in this litigation contain no more than a mere rearrangement of elements functioning as they did in his French patent no. 1, obviously the general statement of the defendant just quoted would have great weight Assuredly the simple process of transforming a horizontal lever into a vertical one is manual and involves workmanship instead of invention.
Invention, it has been said, originates in mental conceptions evidenced, so far as this case is concerned, by practical and operative devices or mechanisms inherently new and novel, and if the plaintiff’s patent fails to meet this test obviously it is invalid. The defendant does not challenge the fact that invention is present when a patentee makes use of elements old in the art and by a new and novel combination thereof produces a mechanism which functions in a new way. If this precedent had not long since been established inventive progress would be decidedly impeded, and the exercise of the inventive faculties restricted to a very limited scope.
*854 Tbe Wrigbt brothers were the pioneers in this art. Quoting from one of their many interviews and articles, we find this statement, a matter of record in this case: “The problem of the real power-driven flying machine was exactly what we knew it must be — the question of equilibrium.” Plaintiff, although he endeavored to, did not solve that problem; his mind, so far as present issues are concerned, and his experiments were directed toward the creation of a mechanism which would control the organs of an airplane which admittedly function to restore equilibrium when it is disturbed, a mechanism as indispensable to the flight of a plane as the wing sui'faces thereof.
The Wright patent to be considered in this case was issued May 22, 1906, and the mechanism disclosed to operate the organs of equilibrium and directional control are described in finding XXXI. It was a cradle located upon the lower wing of the plane and connected with the directional rudder at the rear of the same, and also with the wings, so that the pilot flying in a prone position on the wing of the plane could by movements of his body shift the cradle to either the right or left and thus alter the angle of attack of the wing surfaces. Longitudinal equilibrium was obtained by a horizontal rudder or vane, as the finding discloses, located in front of the main surfaces and operated manually by means of a roller located in front of the pilot.
If the ingenuity of scientists in this art had exhausted itself in the control mechanism of the Wright patent, it is not exaggeration to state, but clearly observable, that the-modern airplane would never have been developed. We think we may with confidence assert that there is not a single airplane patent cited as prior art that does not embody attempts to not only simplify a control mechanism, but concerted efforts to create one capable of functioning efficiently, and following the demonstration of the possibility of flight by the Wright brothers, inventors turned their attention to this important feature of airplane control.
The development of control mechanisms exhibits that the difficulties encountered were manifold, and the frequent and instantaneous necessity of operating simultaneously certain *855 organs of control, as well as single ones, was not one of instant and easy solution. The pilot of a plane has various duties to perform, and it would seem that an. operative mechanism which simplifies and expedites the performance of the same embodies something- more than mere mechanical skill.
Inventors repeatedly resorted to dual lever control devices, some of them very crude and others approaching- a solution of the problem. The findings show that prior patentees to the plaintiff employed levers and wheels to effect control of the organs of stabilization and directional control. Some inventors used vertical levers; others, horizontal levers, and still others, a combination of levers and wheels. All of them, however, including plaintiff’s French patent number one, combined operativeness in such a way that the levers and wheels engaged both hands of the pilot and possessed operative defects in the way of inseparable operation which was capable at least of confusing the pilot and fraught with a degree of inoperativeness which precluded their general adoption.
Obviously complication in the operation of a control mechanism, apparent to all interested in the art, centered attention upon mechanisms which would obtain control responses without the inherent defects which characterized those in existence. The art, as we have said, was developing rapidly. Structural improvements and machinery were revolutionizing it, and the need for effective mechanism was acute and imperative. The very best minds of the scientists interested were active in its promotion.
On a preceding page of this opinion the illustrated mechanism of plaintiff’s French patent no. 1, #312753, is inserted. A repetition of its structural features and operativeness is not essential. It is sufficient to observe that plaintiff’s conception as embodied therein was evidently predicated upon a false scientific basis as to the structural features of a successful airplane, and the reaction of essential elements to the air in order to secure equilibrium. The control he attempted to exert over his illustrated organs of control, i. e., the wing surfaces, rudder, etc., of his new *856 plane, was in no sense adaptable to his subsequent planes or to the numerous other planes then perfected for flight. We are confirmed in this respect by defendant’s own distinguished expert. On cross-examination he was asked: “In the 1906 patent what would be the result if you were to merely turn the lever 22 upward instead of rearwardly in a horizontal direction as it is in the patent?” The response to the question is as follows: “It would not work.” Again he was asked, “You would still, by moving it forwardly and backwardly, control the longitudinal stabilization but you could not execute the lateral movement necessary for lateral stabilization.” The answer was, “You could not.”
In addition to what we have just said, the record shows that plaintiff’s scientific knowledge immediately disclosed to him the fatal defects in his first French patent, and he promptly abandoned it. No such device was ever constructed, and, almost immediately following, the vertical lever mechanism came into existence. In the case of Olmsted v. Andrews & Co., 77 Fed. 835, 839, cited in defendant’s brief, the court said: “It is not, however, invention to cause a device to work vertically that theretofore operated horizontally.” The patent in the Olmsted case was for a map case, a device to secure a map in a convenient and accessible form and preserve it from the effects of constant exposure to the air.
The prior art cited in anticipation of the patent was extensive and apropos, and obviously from it the conclusion was inescapable that all the patentee did was to rearrange elements long since combined to accomplish precisely what the plaintiff’s patent did. The alleged similarity between the Olmsted case and the instant one is nonexistent. We are dealing here with a developing scientific art of vast importance and in a formative state. The Wrights flew their first plane in 1903 and plaintiff’s French patents are dated in 1907, but four years later. A successful and approved operative mechanism functioning to control the ailerons, elevator, rudder, etc., of an airplane when in flight and advance the art towards perfection we feel confident in saying had not been invented.
*857 Plaintiff’s experiments and his own flights enabled him to comprehend the necessity for a mechanism such as he conceived. He brought into tangible form a single vertical lever combined with essential operative elements which successfully operated the organs of an airplane it was designed to operate, and in a way they had not been operated previously, and this he accomplished as a noted scientist in the art and after years of experimentation and knowledge of its needs and in no other way. In Robinson on Patents, Yol. 1, pp. 123-123, the author states:
“ To him alone whose mind conceives the perfect, practical, operative idea — that idea which, when embodied in tangible materials, will accomplish the desired resulb — belongs the right of the inventor and the credit of performing the inventive act.”
Viewing the two patents retrospectively and years after the patent in suit has firmly established its worth, it is not at all strange that the changes effected by the patentee in the two devices disclosed give rise to a conclusion that all that was accomplished by the change was a mere rearrangement of elements and one which would readily suggest itself to one skilled in the art. True, no one skilled in the art suggested the change and as established by the record no previous inventor comprehended the additional and vastly important results which the new mechanism brought about.
In the case of Root Refining Co. v. Universal Oil Products Co., 78 Fed. (2d) 991, 995, recently decided, a case involving the general principles of patent law applicable to patents which although simple in construction are nevertheless an advance in the art, the court used the following language:
“ What Dubbs did now seems simple and just what any one skilled in the art would have done. ‘ This, however, is but the common history of important inventions, the simplicity of which seems to the ordinary observer to preclude the possibility of their involving an exercise of the inventive faculty.’ Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 S. Ct. 698, 709, 46 L. Ed. 968. ‘ It is often difficult to determine whether a given improvement is a mere mechanical advance, or the result of. the exercise of the creative faculty amounting to a meritorious invention. ’ The fact *858 that the invention seems simple after it is made does not determine the question. If this were the rule, many of the most beneficial patents would be stricken down.’ Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 S. Ct. 652, 655, 53 L. Ed. 1034.”
On the other hand, judging efforts and accomplishments in the light of the contemporaneous development of the art, so radical a departure from the mechanism disclosed in plaintiff’s first French patent, both in structural features and operativeness, as well as results which followed, must, we think, compel a conclusion that plaintiff’s patent discloses a new and novel mechanism, one accepted and put into almost general use in light airplanes and continued in such use to- the present day.
Esnault-Pelterie brought suit against the Chance Vought Corporation for an alleged infringement of the same patent involved in this case. The cause was first heard in the United States District Court for the Eastern District of New York, and decided by that court in a written opinion announced February 29, 1932 (56 Fed. (2d) 393). The District judge dismissed plaintiff’s bill of complaint and subsequently on appeal to the Circuit Court of Appeals the decision of the District Court was affirmed (66 Fed. (2d) 474). The opinion of the Circuit Court of Appeals follows substantially the opinion of the lower court.
From statements of facts in both opinions we are confirmed in our belief that the record before this court must be in some important particulars very different from what it was before the courts mentioned.
In speaking of plaintiff’s 1906 patent #312753 both opinions hold that the whole equilibrium of the machine may be controlled by the pilot by the use of one hand. The evidence in this case, as previously observed, is to the contrary and emanates in part from defendant’s expert witness. It is obvious from the present record that the control mechanism of the 1906 patent would be wholly inoperative if the horizontal levers were simply transposed into vertical ones, and we fail to find in the record any controversy over the fact that the 1906 mechanism engaged continuously both hands of the pilot, and, in addition to this, the expert testimony *859 establishes that any vertical movement of levers 22 and 2B of the 1906 patent would result in a contrary or opposite longitudinal equilibrium control.
A conspicuous divergence in proved facts between the record in the Vought case and the instant one appears from the statement in the Vought opinions wherein it is stated (page 401 of the District Court’s opinion) that “ in neither of the machines embodying such invention, manufactured abroad, was the plaintiff able to accomplish sustained flying for any considerable distance.” Again, in the opinion of the Circuit Court of Appeals it is said (page 475), “None was ever put into commercial use”, and on page 477 it is stated “ nor was it used in the only embodiment made by the patentee.”
Manifestly an omission to supply testimony of the importance noted above, especially as to the reception accorded the mechanical device of plaintiff by those skilled in the art and its almost universal use in light airplanes in both this country and abroad, would lead inevitably to the quoted statements. Findings VI and XLVII portray what the record in this case indisputably establishes, and supply positive proof of precisely what the plaintiff accomplished, both in the matter of making flights and the commercial demand for planes embodying his invention.
It is true the defendant seeks to minimize the importance of plaintiff’s flights and in so doing cites their brief duration and slight altitude attained. “His flights”, the defendant says, “may be better denominated as ‘hops’.” It is true that some of them were of brief duration and the altitude obtained in nowise extensive; however, it must not be overlooked that on the date of plaintiff’s initial flights even “hops” in a heavier-than-air plane were accomplishments. Assuredly the defendant would not designate the flight of the Wright brothers at Kitty Hawk in 1903 a hop, and yet it did not greatly, if at all, exceed the first flights of the plaintiff. The modern airplane motor had not at that time made its appearance.
Prior Art
The defendant in its brief refers to the French patent to Laroze as the most important disclosure.
*860 The Laroze patent was considered by the Patent Office before the patent in suit was issued and was discarded by the examiner as not anticipatory.
The Laroze patent discloses an airplane provided with a vertical control lever, which can be swung in a fore-and-aft direction for the purpose of controlling the longitudinal attitude of the machine. A wheel is mounted vertically on the top of the lever. By means of swinging the wheel the lever may be rotated about its own vertical axis for the purpose of controlling the transverse attitude of the airplane. By turning the wheel on its horizontal axis the machine may be steered.
The result of this construction is that if an attempt were made to operate the longitudinal control by grasping the wheel on one side by one hand there will inevitably result a movement of the lateral control as well. When the pilot wishes to nose up or down he will also find he is operating the lateral control. Lateral control movement similarly results also in a disturbance of the longitudinal equilibrium.
This control could not be operated by one hand. Both hands must be used, one on each side of the wheel, in order to keep the movable lever or post in any predetermined position. But, even under these circumstances, the Laroze control of equilibrium is very confusing mentally and physically. If we imagine the vertical lever stationary and a lateral control movement to be given by the pilot swinging the wheel with two hands, it is evident that one hand and arm will move forward while the other hand and arm are moving backward. But in the majority of instances compound movements are required involving lateral and longitudinal equilibrium control simultaneously. This means that the arms will be required to make opposite movements for the lateral control, and forward or backward movement simultaneously for the longitudinal control. Essentially this requires sometimes a backward movement of one hand and a long forward movement of the other hand, or a slight forward movement of one hand and a long backward movement of the other hand, or perhaps no movement whatever of one hand and a long forward movement of the other *861 hand. Or, if the maneuver requires an opposite longitudinal control movement, the longer movements would be in a backward direction. As these control movements frequently are required to be instantaneous, the confusion, both mental and physical, is apparent.
When this is contrasted with the single direct movement of the joy stick in any direction to correct any combination of longitudinal and lateral control movements which are ever required, the value of the joy stick is apparent.
Another feature of the Laroze patent is that the patentee connects his steering control inextricably with his attitude control. Such steering not only superimposes upon the hands and arms the necessity for reverse movements in a different plane, but in addition to this it clmiges the value of all of the lateral control movements. This is apparent because, as the two hands rotate the wheel to- steer, they require either less or more movement to effect a given amount of lateral control.
The Laroze patent does not disclose any single directional response which causes the plane to move in the direction the joy stick is moved. Nor does the Laroze control with .its complicated motions in any way involve the instinct of the pilot. The Laroze patent does not possess a steering lever separate from the equilibrium control and with all these marked differences we believe it to be clear that the Laroze French patent does not anticipate any of the claims of the patent in suit.
The German patent to Schussler, #85326 of 1896, dates back to a time when aerial dynamic flight and its problems were unknown, and is typical of some of the earlier visionary and inoperative structures of that period. This patent discloses an umbrella-like wing as a supporting means; a cage-like frame is connected to the approximate center of this wing by means of a universal joint mounting, this frame containing a seat for the aviator. This device is intended to be propelled through the air by means of a pair of oars which is operated by the feet of the aviator. There is a dependent rod which is rigidly attached to the wing, the lower end of which is provided with a crossbar which the *862 aviator grasps in his hands. This dependent steering rod is stated “to give the sail any desired inclination in relation to the frame.” The best operation which we can ascribe to this disclosure is that the wing might function as a kind of parachute, and by pushing or pulling at the rigid rod attached thereto the aviator may shift his bodily position in the universally mounted framework in which he sits with respect to the umbrella-like supporting surface and thus change the center of gravity. The Schussler patent does not disclose any of the fundamentals of the broad claims, 2 and 6, in suit which require that equilibrium control and steering be separate; also Schussler has no “means” such as an elevator for maintaining longitudinal equilibrium and no “means such as distortable wings” for producing lateral equilibrium. The disclosure of the Schussler patent is not anticipatory of the claims in suit.
United States patent to Simpson, 909468, was issued January 12, 1909, subsequent to the application for the patent in suit, but on an application filed January 14,1907, approximately five days before the effective date of the patent in suit. It therefore merits consideration from the standpoint of prior invention.
This patent discloses and relates to a boat of the hydroplane type. The hull of this boat is formed of two parallel pontoons, and when the boat is under propulsion these pontoons are intended to be lifted from the surface of the water by three submerged depending hydroplane surfaces, one of which is located at the front and two at the rear of the boat. These hydroplane surfaces are pivoted to the hull, and cables are connected to them and lead to a drum located at the lower end of a vertically disposed column adjacent the pilot’s seat. By means of a horizontal wheel fixed to the top of the column the drum may be turned and the cables wound about or released from the drum. The pilot by turning the wheel thus simultaneously controls the lifting effect of all three of the hydroplane surfaces.
The vertical shaft rotates in a sleeve which is universally mounted, so that by bodily moving the vertical wheel in any direction the pilot tilts the shaft and can thus move the *863 drum at the lower end thereof in any direction. By such an arrangement if the pilot pushes the wheel forward such motion increases the incidence of the front hydroplane and decreases the incidence of the rear hydroplane, thus causing the boat to incline upward at the bow. The bodily movement of the wheel to the right increases the incidence of the right hydroplane, causing the boat to roll to the left, and vice versa.
We have grave doubts that this structure, which is in the marine art and adapted for propulsion on water, is analogous art in the present instance, in which we are dealing with aerial navigation in which directional control is necessitated in all directions.
Entirely aside from this consideration, however, we find the control system of the Simpson patent closely approximating the structure of the control system of the Laroze patent discussed in detail, supra, and therefore differing from the invention in issue for this and other reasons.
The Simpson control, like the Laroze control, comprises an operating wheel mounted on the upper end of a movable column. Such mounting fails to provide any fixed fulcrum for the operation of the wheel, and any single force applied at any point on the operating wheel has no fixed or determinable response. Moreover, during all times that the Simpson-boat is under way there is a pull or tendency on the cables to unwind from the drum, which tendency is transmitted to the wheel in the hands of the pilot. The pilot by maintaining this wheel in a more or less wound-up condition gives to the hydroplanes their lifting effect, and should the pilot perchance release the rim of the wheel at any time the cables will unwind from the drum, and the lifting effect of the hydroplanes will be negatived. As the top of the column on which this wheel is mounted is itself movable in all directions, the pilot must therefore continuously hold the wheel with both hands, as the release of either hand will permit the wheel to move relative to the movable column.
We fail to see how this complicated control structure either anticipates or suggests to those skilled in the art the *864 single lever airplane equilibrium control of the patent in suit. In addition, and with respect to the more limited claims, the tilting of Simpson’s wheel and column in any-given direction is intended to produce a corresponding rise of the Simpson boat in that direction, which is exactly the reverse of. the instinctive action and directional response found in the more limited claims 7 and 8 of the patent in suit.
United States patent to Wadsworth 213079; British patent to Wilson 20022, of 1889; and United States patent to Weeber 704156, may be considered together, as they are all clearly nonanalogous art. The patent to Wadsworth, while disclosing a single vertical lever mounted on a universal joint, is adapted for the control of two engines or mechanisms, one engine being controlled by the motion of the vertical lever in one plane, and the second engine or mechanism being controlled by the motion of the lever in a plane at right angles to the first plane. The patent discloses that these two engines may be respectively the steering engine and the propelling engine of “ steam vessels or traction engines and the like.” Certainly this patent, issued in 1879, does not in any. sense suggest the concept of the equilibrium control of an airplane.
The British patent to Wilson relates to a horizontally mounted lever movable in all directions and operating a series of electrical circuits for the remote control of searchlights, guns, telescopes, and the like. There is no fixed relationship between any given position of the control lever and the position of the device controlled by it. This patent contains no reference whatsoever to aviation.
United States patent to Weeber relates to a steering and braking device for automobiles. It comprises a steering handle or tiller adapted to be swung from side to side for steering the vehicle, and the same lever is movable in an up and down direction or forwardly and rearwardly, with respect to the driver, for applying the brake of the vehicle. These functions are obviously entirely remote from the equilibrium control of an airplane, and the mere fact that an automobile may possess the samé kind of an engine (inter *865 nal-combustion engine) that an airplane has, or that the airplane moves on a surface of the ground prior to take-off and subsequent to landing, does not, in our opinion, place the Weeber disclosure in an analogous art, but whether analogous art or not there is nothing whatever in the disclosure of these three patents which would suggest to those skilled in the art the lateral and longitudinal equilibrium control of an airplane by means of a single universally mounted lever.
The remaining prior art patents, discussed by defendant in its brief, namely, the French patent to Penaud and Gauchot, British patent to Davidson, French patent to Macedo, German patent to .Jung, and British patent to Quentin, have been considered in detail in our findings XXV, XXVI, XXVII, XXX, and XXXV, respectively, and it is unnecessary to reiterate here the facts relating to their disclosures. As indicated in these findings, all of these patents lack one or more of the essential elements necessary to anticipate the invention in suit.
Thh Ferbeb Defense
Defendant ascribes paramount importance to the work of Captain Ferber of the French Army. From 1902 to 1906 Captain Ferber carried on aeronautical experiments with gliders and airplanes. His first experiments were carried on at Nice, France, and he continued them there until 1904, thereafter transferring his location to an Army post at Chalais-Meudon. In 1904 Ferber published a booklet entitled “The Progress of Aviation since 1901 by Gliding Planes”, and in 1906 his second publication, entitled “The Progress of Aviation by Gliding Planes — Step by Step, Jump by Jump, Flight by Flight”, made its public appearance.
We discuss these publications and what followed their introduction somewhat in extenso, because not only the defendant emphasizes their importance as a defense, but the United States District Court for the Eastern District of New York, 56 Fed. (2d) 398, in an opinion holding plaintiff’s patent rights to a narrow and restricted scope, after- *866 wards affirmed by the Circuit Court of Appeals for the Second Circuit, likewise accorded them determinative weight, which we believe under the record before us and the principles of patent law we can not follow.
Captain Ferber was a very distinguished and capable pioneer in the art of aviation. His 1904 booklet is a very comprehensive review of the progress of the art, setting out the contributions of well-known experimenters, including among others Lilienthal, Pilcher, Chanute, Wright brothers, Professor Langley, and other well-known persons interested in bringing into being a successful flying airplane. The book abounds in numerous illustrations of the general appearance of the structural features adopted by the experimenters mentioned and discussion of accomplishments. In this volume he does not mention the experiments of plaintiff, and as to the others, especially as to any detail of equilibrium control such as here involved, the disclosure is without merit, and valuable in the art only from a scientific standpoint as to the chronological progress disclosed in its evolution from gliders to motor-propelled planes. This booklet as we view it possesses no probative value in an effort to establish anticipation in this case.
Ferber’s 1906 edition is precisely in- accord with its title, a continuation of the series of events and progress made in the development of the art, copiously illustrated and generally descriptive. Both publications disclose and describe an airplane, as finding XL shows, having a front elevator and triangular “ foes ” or jibs located at the opposite extremities of one of the supporting plane surfaces. These jibs were mounted to turn on a vertical axis and when turned acted to increase the resistance of that end of the plane, thereby having a directional steering function. In neither of said publications is there any description of the means by which said “ foes ” or “ jibs ” were controlled, and no disclosure whatever of the operating means or mechanism for controlling the longitudinal or lateral equilibrium of the planes. We have searched with the utmost care to discover wherein either publication in any way teaches or instructs those skilled in the art any concept of plaintiff’s invention. We think they do not, and that finding XL is amply sustained *867 by the record. What we have just said is confirmed in fact by the proceedings of the defendant exemplified by the taking of testimony in France. The belated depositions taken some twenty-five years after the event, so far as directed to an attempt to establish knowledge upon the part of plaintiff of Captain Ferber’s work in France prior to his invention date, i. e., January 19,1907, are admissible; such knowledge of course would preclude the possibility of his believing he was the first and original inventor of the invention claimed.
The depositions, however, went further into the subject matter, and from the discussion of the Ferber defense as it appears in both the opinions of the District and Court of Appeals of New York, cases cited supra, we infer consideration was given this testimony wherein the witnesses amplified the prior publications of Ferber in the way of detail recitals of the structural features of Ferber’s planes. Judicial precedent precludes the consideration of such evidence offered for that purpose. The authorities are numerous and to the precise point.
Section 4923, Revised Statutes, provides as follows:
“ Whenever it appears that a patentee, at the time of making his application for the patent, believed himself to be the original and first inventor or discoverer of the thing patented, the same shall not be held to be void on account of the invention or discovery, or any part thereof, having been known or used in a foreign country, before his invention or discovery thereof, if it had not been patented or described in a printed publication.”
In Milburn Co., v. Davis Co., 270 U. S. 390, 400, the Supreme Court in deciding the effect of the foregoing statute, said:
“ * * * and by the words of the statute a previous foreign invention does not invalidate a patent granted here if it has not been patented or described in a printed publication. Rev. Sts. Sec. 4923. See Westinghouse Machine Co. v. General Electric Co., 207 Fed. 75,”
and in the Westinghouse case referred to in the opinion the court said:
“ * * * Section 4923 deals specifically with the effect of knowledge and use in a foreign country, and it makes no *868 distinction whether such use is made or such knowledge is acquired by persons who, after using the thing or acquiring the knowledge, remain abroad or come here. This section (4923) provides that the patent taken out by an applicant for the same thing here shall not be void on account of such knowledge or use unless the invention had been patented or described in a printed publication. As we construe this section, reduction to practice in a foreign country can never operate to destroy a patent applied for here, however widely known such reduction to practice may be, either among foreigners or among persons living here, unless the invention be patented or described in a printed publication. To that extent section 4923 qualifies the language of section 4886, which without such qualification might well lead to' a different result.”
The probative value of prior publications is to be found in precisely what the publications state. If the articles relied upon describe the invention “ in full, clear, and intelligent terms as to enable persons skilled in the art to comprehend it, and reproduce the article claimed, without assistance from the patent ”, manifestly priority of invention is established. The Circuit Court of Appeals for the Southern District of New York, in the case of Badische Anilin & Soda Fabrik v. Kalle et al., 104 Fed. 802, 808, used this significant language.
“ Nor would the knowledge or experience of any number of chemists (unpublished to the world) that the phrase was ‘ erroneous ’, or a 1 mistake ’, or £ an interpolation ’, change the situation. The ‘ description in a printed publication ’ of the statute is to be found within the four corners of such printed publication. Judge Coxe tersely and accurately expresses the law and the reason for it in the following passage:
“ ‘ The question is, What does the prior publication say? not what it might have said, or what it should have said. If prior patents and publications can be reconstructed by extrinsic evidence to fit the exigencies of the case, the inquiry will no longer be confined to what the publication communicates to the public, but it will be transferred to an endeavor to ascertain what its author intended to communicate.’ ”
In the case of Permutit Co. v. Wadham, 13 Fed. (2d) 454, 456, the Circuit Court of Appeals for the Sixth Circuit said:
*869 “ Such publications cannot be effectively supplemented by proof that foreign devices which are now said to be the embodiments of the publications were actually constructed at the time and did successfully perform. iSuch proof is self-destructive. There can be no need for it unless upon the theory that the actual construction shows precisely what was intended by the published description,- and, if the description is ambiguous enough to need this kind of support, it is fatally deficient.”
Additional authorities are available; we will forego their citation. The rule is so firmly established and the reason for it so apparent that we experience little hesitancy in saying that the prior publications of Captain Ferber as a matter of fact fall so far short of establishing anticipation and fail so perceptibly to establish prior knowledge of his work upon the part of the plaintiff, that the evidence offered served only to delay a final determination of this case. From the present record it is our opinion that the Ferber defense is vulnerable in the respects noted and does not supply a basis either of anticipation or to in any way enlighten the court as to the operating means employed for controlling the longitudinal and lateral equilibrium of his planes. The fact that Ferber succeeded in flying an airplane, and was the first aviator to do so in a foreign country, does not in the light of the record before us disclose moi'e than the possession of some general means for controlling the organs of equilibrium, and leaves us without knowledge as to his mechanism. The issue presented to this court is limited to an alleged invention for controlling the longitudinal and lateral equilibrium of an airplane separately from steering control when the same is disturbed, by a single instrumentality taking the form of a vertical lever and known as the “ joy stick.”
The Blériot Defense
Defendant also contends that Louis Blériot, a French experimenter and manufacturer of airplanes, was the inventor of the “joy stick” control, as exemplified by plaintiff’s patent. This contention is predicated upon a letter written to Armengaud, the patent attorney for Esnault-Pelterie, by P. A. Yautrin who constructed an airplane for Blériot, which *870 letter and sketch accompanying- the same are set forth in finding XLIII. The letter was written on February 10, 1911. Reference is also made to an agreement prepared and signed by Esnault-Pelterie and Blériot on November 1, 1911. The preamble of this agreement contains the following recital:
“ In consequence of claims made by Mr. Esnault-Pelterie against Mr. Blériot, relative to his single bell lever, Mr. Blériot has been able to prove to> Mr. Esnault-Pelterie that he was in prior, legitimate, and personal possession of the invention — that is to say, of the single lever mounted on a cardan joint — by proofs accepted by Mr. Esnault-Pelterie.”
The expression in this contract, “in prior, legitimate, and personal possession of the invention” is a phrase peculiar to the French patent law. It indicates the secret possession of knowledge legitimately obtained and is not an admission of priority of invention. Neither the Vautrin letter of February 10, 1911, with its sketch, nor the contract between Esnault-Pelterie and Blériot under date of November 1, 1911, is indicative in any manner to show what knowledge, if any, the plaintiff Esnault-Pelterie had of Bleriot’s work on January 19, 1907, the effective filing date of the patent in suit. The defense is without merit to establish previous invention, and for the additional reason stated in finding XLVI.
The prior art cited by the defendant, in our opinion, signally fails to establish anticipation, and if we are correct in our consideration of the subject there is not a single art structure in the record disclosing a mechanical device where the entire equilibrium of an airplane may be controlled with a single instinctive tilt of a single control stick in any direction, causing the plane to tilt in a similar direction.
Plaintiff’s mechanical structure accomplished what had not theretofore been accomplished. The mechanism patented supplied precisely what the art at the time and in many respects needed. It is, we think, not to. be challenged for lack of novelty or restricted to a narrow scope because of its simplicity when, as we believe, it was not only adaptable to existing airplanes of varying types but actually installed therein and continuously used.
*871 Plaintiff was experimenting in an art that exacted a high degree of scientific knowledge. That he was capable and efficient is not denied, and to bring his conception of a control device into operation and adapt it to heavier-than-air flying machines exacted more than mere mechanics, for unlike mechanisms stationary in character plaintiff in making his invention had to possess the knowledge requisite to an understanding of the elements of the air, the various .means and instrumentalities employed to engage or combat them and thereby attain successful .flight. No one would now say that a horizontal elevator, constructed and attached to an airplane as it is now, involved no more than mechanical skill, because it must have been known that a successful airplane, would of necessity have to ascend and descend. From the beginning the question of an efficient control of the various elements for maintaining the attitude of an airplane was an important and indispensable one.
Of course, plaintiff’s system was an improvement over prior ones. Most patents, we may safely say, are for improvements. De Forest’s basic radio tube can scarcely be identified when compared with improved ones. Future development attended Edison’s incandescent lamp, and plaintiff’s patented system embodied in his device was likewise a forward step adapted to secure control of the essential elements of an airplane established and recognized as scientifically adapted to obtain flight.
Common knowledge obtained by sight alone discloses that an airplane in taking off tilts in some degree and that prudent pilots do not obtain altitude precipitously. Descents and landings are not accomplished save by resort to equilibrium controls, and while a plane may maintain its attitude under some conditions without resort for • a considerable time to equilibrium controls, it -is manifest that no airplane, however constructed, would even so much as leave the ground without their presence, and in addition to .this it exacted considerable. time and effort to finally create a mechanism that would successfully function to actuate the -control organs, and add to the safety of flight.
The system which we believe the plaintiff invented combined simplicity of operation with natural law,s of gravita *872 tion and introduced into the art a safe, efficient, and scientifically constructed mode of .control, not theretofore in use or invented, and all that remains is to discuss the issue of infringement.
Infringement
Three types of airplanes, known respectively as the Cur-tiss, De Haviland, and Loening, are alleged to infringe the patent in suit. (See finding XIX.) As .set forth in detail •in our findings XXI and XXII, all three of these types of airplanes in general possess a single vertical control lever or “ joy stick ” universally mounted at its lower end so that it is capable of moving or tilting in any direction. A transverse movement of this lever operates a hinged portion of •the wings of the airplane- so that the contour of the wing surfaces is distorted or altered for the specific purpose of controlling the lateral equilibrium of the plans. Manipulation of the “ joy stick ” or lever in a fore-and-aft direction controls a rudder or rudders pivoted on a horizontal action in such a manner as to control the longitudinal equilibrium of the airplane. In all of the Government structures the connections existent between the “ joy stick ” and the control surfaces of the airplanes are of such a character as to cause the airplane to tilt in the same direction as the tilt of the stick, and the response of the airplane is thus in accord with the instinctive balancing sensations of the pilot.
All of the Government structures possess a separate lever (foot operated) for controlling the steering rudder. For the purpose of making the Government construction clear we reproduce on the following page one of the exhibits in the case which illustrates the Curtiss construction. The structure of the De Haviland airplane and the Loening airplane is functionally the same as the Curtiss and in construction of details substantially similar to this illustration.
• Deferring to this illustration, a sidewise movement of the “joy stick” 61' operates through the cables hh1 which are connected to hinged portions of the ends of the upper wing 5, known in the art as ailerons. Manipulation of these ailerons causes a change in contour, or a distorting of the ends of the wing. As we have already stated in our opinion.

*873

*874 “ The .original process of wing warping has been generally if not universally superseded by ailerons, which are con-cededly direct mechanical equivalents for wing warping. (See Wright Co. v. Herring-Curtiss Co., 204 Fed. 597, 607, 608, later sustained by the circuit court of appeals, second circuit. See 211 Fed. 654.)”
A fore and aft movement of the “ joy stick ” 61 operates, through lever arms e e and the cables connected thereto, to raise or lower the horizontal equilibrium control rudders 60, 60. The separate foot lever 68 controls the steering rudder 57 by means of cables.
The terminology of the claims in suit is found to apply to the Government structures word for word and element by element.
Defendant attempts two defenses with respect to the question of infringement. In the first defense it is suggested that the Government does not infringe due to the fact that the claims of the patent in suit use the word “ stability.” In this connection we quote claim 6 as an example of this use:
“ 6. In an aeroplane, the combination of means for producing lateral stability, means for producing longitudinal stability, means for steering in a horizontal plane, a single vertical level movable in every direction for operating both said means for producing lateral stability and said means for producing longitudinal stability, and separate means for operating said steering means.” [Italics .ours.]
Defendant alleges that “ stability ” is that property of an object which enables it to return to its original position if it is disturbed, and states that “ in modern airplanes that is accomplished by the: fixed stabilizer in the case of longitudinal stability and by the dihedral angle of the wings in the case of lateral stability. These are parts of the structure, built into the machine and producing inherent automatic stability. The stabilizer and the dihedral are not subject to the manipulation of the joy stick. The latter is not in combination with them. Thus, the modern structures do not read on the claims.” In other words, the Government urges that the modern airplane is self-balancing and is not dependent upon equilibrium “ joy stick ” control to preserve its proper attitude. Much testimony has been presented by *875 various of defendant’s experts as to the self-flying properties of the modem airplane. This argument, however, is to a certain extent fallacious as the three types of airplanes alleged to infringe cannot by any- means be considered as modern, nor is it at all certain that they possessed this so-called self-flying property stressed by the defendant. As a matter of fact, Captain Hegenberger, one of defendant’s expert witnesses, was asked specifically about the Curtiss JN-4. The question and his answer are as follows:
“ Q. How about the JN-4? Has every plane of that type that you have flown had such inherent stability that you could fly it hands off?
“A. The JN-4 longitudinally bordered on instability.”
In the second place, if an airplane can be designed to fly itself, why is it necessary to spend so much time instructing aeronautical pilots in the art of blind flying, as has been brought out by defendant’s experts? If an airplane gets in a fog bank or a cloud and has this alleged property of flying itself by automatic inherent stability built into the plane, why does the pilot not release the controls and let the plane fly iself? In fact, why use the controls at any time?
The final answer to all this argument is entirely obvious. A patentee has the right to be his own lexicographer, and any court will unhesitatingly accept a definition of a word or phrase used by the patentee if it is ascertainable from the patent. It is no defense to a charge of infringement of an apparatus or a combination described in the claim in a patent that some part of it was misnamed therein by the patentee, or that the infringer has called it by a different name. (See Advance Rumley Co. v. John Lauson Mfg. Co., 275 Fed. 249; Century Electric Co. v. Westinghome Elec. & Mfg. Co., 191 Fed. 350, 366.)
From the patent in suit it is entirely clear that by “ stability ” the patentee means what we have termed “ equilibrium” or “equilibrium control” throughout this opinion.
The three alleged infringing planes of the Government all possess the single vertical lever movable in every direction for controlling the lateral or longitudinal equilibrium *876 of the plane connected to controlling surfaces having the same functional effects as those disclosed in the patent, and the Government cannot escape infringement on the rather remarkable theory that the Government planes fly themselves.
The second defense theory advanced by defendant as to noninfringement is that the claims, if valid, should be limited to a combination comprising a single integral or unitary tail structure, and should not cover the tail structure such as is present in the Government airplane alleged to infringe, and which comprises an independent horizontal and vertical rudder.
It is, of course, well settled that the courts, in order to save the patentee from the invalidation of a claim, due to prior art or a prior use, will frequently put a narrow construction on a claim S0‘ as to conform it to the exact disclosure of the specification, and thus save the claim from invalidity. This is not necessary in the case at bar. As we have already indicated in our consideration of the rather voluminous prior art cited by defendant, there is nothiiig in the prior art which is of an anticipatory nature. The mere fact that the plaintiff elected in the patent in suit to disclose his equilibrium control lever and the separate steering lever connected to a particular kind of a tail structure should not limit the claims , to use of that of an integral vertical and horizontal rudder structure. It is the control-, ling means or lever which is the essence of the invention at issue, as defined by the claims, and not the tail structure of the airplane. The only difference between the' elevator and rudder of the Government structures and the elevator and rudder of the ring-tail embodiment disclosed in the patent in suit is that the former has separate mountings to the fuselage, while the latter-has a single mounting to the fuselage. In each case the steering rudder and elevator possess similar functions.
There is some testimony in the case on behalf of the defendant as to what may be termed “cross responses.” The theory of this is- that the mounting of the 'integral tail *877 structure of the patent in suit is such as to cause the steering rudder control means to affect the equilibrium of the plane and the equilibrium control of the plane to affect the steering control, and therefore certain claims do not properly find foundation in the specification of the patent in suit for steering means “separate” from equilibrium controlling means. There is no merit to this argument.
On July 16, 1931, plaintiff caused certain’ flights to be made at Amityville, Long Island, with a plane having a tail structure of the ring-tail type similar to that disclosed in the patent in suit. The facts as found .in Finding XVII with respect to these flights were.that the steering and stabilizing levers were mechanically separate and independent and each lever performed its own function, regardless of the manipulation of the other lever.
Also, in certain tests made by defendant of an airplane having a ring-tail structure it was found that when the ring-tail structure was restrained the cross responses were negligible. (See Finding XVI (c).) Such restraining of the ring-tail structure from side swing is in accordance with the disclosure of the patent in suit, which specifically refers to horizontal and vertical rudders. (See Finding XV.)
Even without such restraining, such cross response as is present does not impair the operativeness of either the steering control lever or the equilibrium control lever, and each lever performs its own function regardless of the position of the other lever.
In conclusion we hold that the patent in suit is valid and has been infringed by the defendant. Plaintiff is therefore entitled to recover. Pursuant to an agreement of the parties it is ordered that the case be remanded and referred to Commissioner Gordon to take testimony upon the question of reasonable and entire compensation, and report to the court.
Wiialet, Judge; Williams, Judge; LittletoN, Judge; and GREEN, Judge, concur.