Booth, Chief Justice,
delivered tbe opinion of the court:
This is a patent case. The plaintiff was granted letters-patent #1499472 on July 1, 1924, upon an application filed July 14, 1922. The subject-matter of the patent is an airplane-landing mechanism. The plaintiff alleges infringement of his patent by the defendant and seeks a judgment for damages.
The record in the case is quite voluminous, and the great number of prior art patents, as well as publications introduced, entails a- lengthy discussion of the issues of validity and infringement.
The landing of an aeroplane, especially within a restricted area, represents the most difficult aspect of flying, and involves three distinct phases which may be referred to as (1) the approach, (2) contact, and (3) the roll.
In coming in for a landing, the pilot must approach the landing area at a flying speed sufficient for the reaction of the air on the control surfaces to provide adequate and instant control of the plane. This, therefore, demands that the speed of the plane during approach should not be reduced below a safe flying minimum.
When the plane is in proper location with reference to the landing area its speed is then reduced and contact with the landing area takes place.
After contact the plane continues to roll forward due to its inertia. During this last phase of the landing operation the plane loses its aerodynamical qualities and functions as a land vehicle. During the roll and in order to restrict the length of the same, a retarding force may be applied by means of brakes, drags, snubbers, etc., as indicated by the predominating concept of the prior art.
Plaintiff in the invention in suit approaches the problem of accomplishing a safe landing within a greatly reduced area, such as the deck of a ship, by the application of a retarding force to the aeroplane not only during the roll but prior thereto and while- the plane is still in flight. The retardation thus begins in the first phase of the landing *26 operation, thereby conserving to the utmost the landing space! available.
The invention in suit furthermore teaches how such application of retarding force may be accomplished with the plane in flight in such a manner that the plane is maintained in correct alinement with its path of travel.
In the present case the infringement alleged is the use by the defendant of plaintiff’s landing mechanism in making landings upon the ship’s deck.
As early as 191Y the use of land planes in conjunction with Naval activities became the subject of Naval investigation and experimentation in both this country and abroad. The superior speed of land planes over hydroplanes gave to the former more value in the case of war, and it was with the hope of devising some operative mechanism functioning to accomplish the landing of a land plane upon the deck of a ship that a continuous effort upon the part of those skilled in the art obtained.
Hydroplanes capable of remaining afloat were found to be unavailable. Their rate of speed was incomparable with land planes, and to hoist them aboard as well as to launch them from the deck of a ship, especially under disturbed water or excessive wind conditions, was hazardous both with respect to the safety of the pilot and the plane. It was seen and realized that if a land plane could with safety land and take off from the deck of a ship the problem of its greatest utility in time of war would be solved.
The state of the art appearing in the record attests the fact that the problem to be solved was not an easy one. The deck of a ship or the landing area of an airplane carrier is necessarily one of limited space. The act of landing a plane involves the correlative act of providing space for its takeoff, and, if more than one plane is utilized, sufficient storage room must be provided. Therefore, to land an airplane within this restricted area was a scientific problem, calling for the exercise of invention.
There are many factors to be taken into consideration in the process of accomplishing what has just been observed. The first is the assured safety of the pilot and the freedom of the plane from injury or destruction. The roll and pitch of the vessel at sea, the disturbed air conditions created *27 by the same, and the discharge of combustion gases from the power plant are all variable factors which must be met and scientifically dealt with in retarding the speed of the plane. The vessel may be in motion or anchored. The exigencies of war are involved.
The British Navy preceded the Navy of the United States in the matter of experimentation in this particular art. Prior to 1919 the British Navy had available at least one airplane carrier, and a United States naval officer was present during certain trials of landing mechanisms thereon. During 1919 the Congress by an appropriation provided for an airplane carrier and one named the Lcmgley was used by the Navy for experimental purposes.
Landing mechanisms to retard the speed of airplanes were also experimented with in making landings upon ground areas. Innumerable mechanisms were tried and tested and many of them proved to be impracticable and inoperative, and were not used. The plaintiff became intensely interested in the development of the art. It is a conceded fact that he was a trained Naval aviator possessed with not only the theoretical but also with the practical aspects of the problem. He had been commissioned a flying instructor during the World War and had extensive experience as a pilot of both land and seaplanes.
In 1918, while serving with the Naval forces of the United States, plaintiff was injured in an airplane crash, an injury which resulted in his honorable discharge from the service, and his return to the Massachusetts Institute of Technology, from which he graduated in 1922, specializing in the study of aviation. At least as early as March 1920 he conceived the patent in suit, and a short time later disclosed it to the Commander of the Naval Aircraft Factory in Philadelphia, who recommended a demonstration of the same to the Navy.
Plaintiff’s financial condition would not allow him to purchase an airplane to use in demonstrating his landing gear. In August 1920 he disclosed his mechanism to naval officials and sought the use of a Navy airplane to test the same. The Navy officials were interested and a Navy airplane was placed at his disposal under the condition that plaintiff would fly the same himself. Subsequently, when arrangements for the test were about completed, the Naval *28 Air Station where the plane was stored was destroyed by fire and the plane destroyed.
At a later date plaintiff’s mechanism was forwarded to the Naval Aircraft Factory at Philadelphia and plaintiff made numerous trips to the same for the purpose of eventually engaging in tests. His relations with naval officials were congenial, numerous suggestions were made, and after several mishaps of no serious character the plaintiff on October 11, 1921, demonstrated the operativeness of his mechanism in a successful test. An official report of the tests was duly made and the fault found with the mechanism was that it retarded the speed of the plane while still in flight, whereas the naval officials thought it wiser to effect retardation after the plane landed.
The plaintiff’s letters-patent contain sixteen claims, and it is alleged that infringement obtains as to fourteen of them. The patented mechanism epnsists of two cooperating parts. One is mounted upon the airplane and the other upon the landing area. Upon the landing area a cable, designated an arresting cable, is wound on drums, passes through pulleys, and a portion of the same is stretched transversely across the landing area in an elevated position above the surface of the same. The drum or drums described are rotatable and designed “to pay out a limited amount of cable”, their rotation being resisted by springs.
In Finding 1 appear detailed illustrations of two forms of plaintiff’s airplane mechanism. In each a pole is mounted longitudinally below the fuselage of the plane, being pivoted at one end; the other is releasably held against the fuselage. The free end is to be dropped to a position well below the landing gear so as to be in a position to engage the arresting cables. “When the pole”, as the findings state, “is in landing-position it extends obliquely downwardly from the airplane, with its lower end projecting some distance below the bottom of the landing wheels.” Fig. 5, Finding I, B'; Fig. 9, B".
Upon the aft end of the pole in Fig. 9 there is a stout hook T>”, the pole B" being mounted by a universal joint shown at O, “some distance in the rear of the center of gravity of the airplane and approximately in fore-and-aft alinement therewith.” Fig. 5 discloses the stout hook D' as removably held *29 on the pole B', becoming detached therefrom when it hooks on to the transverse arresting cable. When the hook becomes detached from the pole B' the arresting force of the transverse cable is then transmitted from the hook to the fuselage by the cable Q. In figure 9 the hook ID" is not detachable; the pole B" takes the place of cable G and functions similarly.
Plaintiff’s concept embodies the creation of a landing mechanism which operates to maintain the factors essential to be maintained in flying an airplane and at the same time applies while in flight a retarding force of suflicient strength to enable the pilot to effect a safe landing within the limits of a restricted landing area. To do this, plaintiff mounts the pole B' in the rear of the center of gravity of the plane and in approximate alinement therewith fore and aft. This is not all he did; the pivotal mounting of the pole B' enables the stout hook D" to engage the transverse cable in such a way as to move thereon and draw the plane into 'correct alinement.
The pilot in making a landing flies towards the arresting cable, and as he approaches it releases the end of the longitudinal pole which upon being released is in a position to strike the same, the pilot flying sufficiently low to enable the free end of the pole to strike the arresting cable, and as the plane crosses it the cable is guided by the pole into the hook, and the force occasioned by the impact is gradually applied by the manner of the mounting of the arresting cable. The retarding force is the greater the greater the speed and weight of the machine and the shorter the landing run desired, other things being the same. Furthermore, in accordance with the teachings of the patent in suit and the structure disclosed in accordance therewith, if for any reason the pilot fails to engage the landing device, the aeroplane is still in flight and the pilot may therefore continue such flight and may then return to make a fresh attempt, the plane being under absolute control of the pilot at all times prior to actual engagement with the landing device.
Plaintiff’s mechanism precludes “nosing over” and minimizes for the pilot the necessity, for the directional control of the plane. What was accomplished was the application *30 of a retarding force at an early moment in the landing operation by a gradual process which slackened speed and overcame the difficulties attending the landing of a plane within a restricted area.
Defendant insists that plaintiff’s failure to file exceptions to the report of the Commissioner of this court, or a disclaimer with respect to certain claims of the patent in suit reported by the Commissioner as anticipated, renders the patent invalid under Section 4922 of the Revised Statutes.
Sec. 4922, R. S. reads as follows:
Whenever, through inadvertence, accident, or mistake, and without any willful default or intent to defraud or mislead the public, a patentee has, in his specification, claimed to be the original and first inventor or discoverer of any material or substantial part of the thing patented, of which he was not the original and first inventor or discoverer, every such patentee, his executors, administrators, and assigns, whether of the whole or any sectional interest in the patent, may maintain a suit at law or in equity, for the infringement of any part thereof, which was bona fide his own, if it is a material and substantial part of the thing patented, and definitely distinguishable from the parts claimed without right, notwithstanding the specifications may embrace more than that of which the patentee was the first inventor or discoverer. But in every such case in which a judgment or decree shall be rendered for the plaintiff no costs shall be recovered unless the proper disclaimer has been entered at the Patent Office before the commencement of the suit. But no patentee shall be entitled to the benefits of this section if he has unreasonably neglected or delayed to enter a disclaimer.
The facts preclude the defense. It is true the Commissioner in his report filed November 1, 1935, found claims 4, 5, 7, 8, and 11 to be anticipated by the prior art. See findings 23, 26, and 29. It is likewise true that plaintiff’s counsel filed his brief and request for findings of fact on April 14, 1936, more than 30 days after the report of the Commissioner had been filed. Plaintiff’s exceptions to a commissioner’s report under the rules of court are required to be filed within 30 days after the filing of the same.
If the record of facts terminated with the above statement defendant’s contention might be forceful. However, *31 after the Commissioner had made his report discovery was made of certain omissions therein, and upon the Commissioner’s statement to the court an order was issued by the court on May 27, 1936, authorizing amendments to the same. In the meantime, plaintiff’s counsel had on April 14, 1936, filed his request for findings of fact in the following language:
The plaintiff, considering the facts set forth in the report of the Commissioner of the Court to be proven and deeming them material to the due presentation of this case, requests the Court to include the same in a special finding of facts (excepting only those portions of the Commissioner’s Findings 23, 26, and 29, which relate to anticipation of claims 4, 5, 1, 8, and 11).
The Commissioner did not thereafter actually file his final report until August 28, 1936, notwithstanding it was stated to be filed as of May 27, 1936. Plaintiff’s counsel elected to stand upon his request for findings filed April 14, 1936, and the case came on for a hearing upon the record and briefs of the parties on October 6,1936.
When the order allowing the report to be amended was filed the rule as to exceptions to the original one was ipso facto extended, and the date of its final filing became May 27, 1936. The plaintiff then had 30 days from that date in which to except thereto; instead, however, of re-dating the request for findings, the plaintiff permitted the ones of April 14,1936, to stand, which he had a right to do.
It is manifest from plaintiff’s request for findings that exceptions to findings 23, 26, and 29 were filed and that plaintiff did not acquiesce to the same. The procedural rule as to exceptions, requiring them to be filed in printing within 30 days from the date of the Commissioner’s report and pointing out the record relied upon to support them, was complied with in essence if not in letter, and the court under the same would not have omitted to consider the merits of the issue upon the pleadings filed.
The following cases are relied upon by defendant to sustain its defense, viz: Ensten v. Simon, Ascher & Co. 282 U. S. 445; Otis Elevator Co. v. Pacific Finance Corp. 68 Fed. (2d) 664, and Hoe v. Goss Printing Press. Co. 31 Fed. *32 (2d) 565. The intent of Congress in enacting Sec. 4922, It. S. and its scope and effect are exhaustively treated by the Supreme Court in the Ensten case (supra). The act is a remedial one, extending conditional privileges to pat-entees which they did not enjoy under the existing rule of law providing that where one or more claims of a patent were held invalid the effect was to invalidate the entire patent.
The duty of a patentee to disclaim the claims of his patent found to be invalid was predicated upon the fact that “good faith and the spirit of the enactment demand that he act with such promptness as the circumstances permit either to vindicate his position or to relieve the public from further evil effects of his false assertion.” (Ensten case, supra, p. 455.)
If the facts and circumstances of the case disclose an acquiescence in the adverse holding of a competent tribunal, Congress did not intend to relieve the situation to the prejudice of intervening rights by permitting the patentee to later assert rights which he had unreasonably delayed in asserting when the claims of his patent were first challenged. The record in this case fails to disclose an acquiescence in the findings of the Commissioner; upon the contrary, both in the request for findings and in the brief, positive disagreement therewith is expressed.
We have referred to plaintiff’s brief, not that it is part of the record in a substantial sense. Courts do not adjudicate cases upon statements appearing in briefs, and defendant’s reference to the plaintiff’s statement in his brief that he did not file exceptions to the Commissioner’s report is to be ascertained by the court from the facts.
In addition to what has been said, the Commissioner system of this court, temporarily authorized by the act of February 24, 1925 (43 Stat. 964), and made permanent by the act of June 23, 1930 (46 Stat. 199), established a system of procedure quite distinct from the usual reference to a special master in patent cases before a United States District Court. Under our rules exceptions to a Commissioner’s report are filed before the court and not the Commissioner. They are considered by the court, and jurisdiction over the report *33 and the entire record in the case is reserved by the court, and findings of fact in a case are not final and conclusive until officially made by the court. In all instances the court reserves the right to pass upon the case as an entirety.
PRIOR art
Eighteen alleged prior patents and seven alleged prior publications are cited as anticipatory. We list them in the findings and make them a part thereof by reference. Many of them do not even remotely anticipate plaintiff’s patent, and we will only discuss the ones which the record discloses to be pertinent to the issues of the case.
Mechanically viewed, the application of any mechanism designed to retard speed operates as a brake. Mechanisms involving brakes are of course numerous. It does not follow, however, that every mechanism falling within the general category of a brake indispensably involves an inventive concept of the necessities of the art, and suggests at once the essential scientific principles to be applied in retarding speed.
Aviators skilled in the art recognized the necessity of a method of retarding the landing speed of airplanes by the application of brakes, and inventors directed their efforts towards this end. The predominating concept of the majority of such inventors was to check the landing speed of a plane after it came in contact with the ground, or a hydroplane after it touched the water. With the exceptions hereafter noted, the idea of retarding a plane in flight and the advantages to accrue seem to have escaped them.-
Lieutenant Commander Mustin, of the Navy, was granted patent #1160529 for “certain new and useful Improvements in Water-Brake Attachments for Hydraeroplanes.” The device patented by the patentee was precisely as stated, a water brake, a “drogue”, or drag, connected to a seaplane near its rear extremity by means of a rope which may be let out by the pilot so as to fall into the water, the device being normally carried in the fuselage of the plane. The retarding of the plane was not the primary objective. What was in the patentee’s mind was to provide a resisting force of sufficient power to cause the tail of the plane to *34 assume an attitude downwardly of tbe front thereof and cause it to “nose up” and thereby increase the angle of incidence of the wings, and prevent injury to the flotation members and the pilot (Finding 25).
It is true that the water weight or drag was attached below the center of gravity of the plane, but it is manifest that a sudden plunge of the same into the water with a seaplane traveling at the minimum speed for a safe landing would inevitably bring about such a substantial elevation of the front thereof and such a sudden shock or strain as to cause a possible injury to both plane and pilot. The mechanism was not used and it does not embrace the invention in suit. The question of landing a hydroplane within a restricted area is not a vital one, for water surfaces do not present the problem involved in landing upon the ground or a ship’s deck. Safety of the plane and pilot in every kind of sea was what Mustin’s patent sought to obtain.
The patent to Le Mesurier is cited as applicable prior art. We reproduce in Finding 29 Fig. 2 as it appears in the patent application. This patent was cited as a reference by the Patent Office in both the original and renewal applications of plaintiff for the patent in suit. The court’s finding with respect to this citation accurately points out the vital difference between Le Mesurier’s conception and the landing gear of the plaintiff. A portion of Le Mesu-rier’s specifications reads as follows:
Thus when an aeroplane E is about to alight as it comes down on the landing surface A it will pass as shown in Fig. 2 in succession over these loops and a hook F suitably disposed on the under part of the aeroplane will engage with certainty one or other of the loops. [Italics inserted.]
The above quotation from the specifications is inserted because the defendant asserts that there is nothing to prevent Le Mesurier from engaging his device with the loops while the plane is still in flight. Again Fig. 2 discloses the hook F as extending obliquely backward slightly above and not below the outer surfaces of the wheels. These facts, with the added disclosures of the patentee, clearly indicate *35 that the inventor did not conceive a landing gear capable of retarding the speed of the plane while in flight.
It is difficult to construe a portion of Le Mesurier’s specifications wherein the position of the hoot F is asserted to be attached to the fuselage of the plane “as near as possible to the center of gravity” with the position of the hook as disclosed in Fig. 2. In Fig. 2 the attachment of the hook is indicated at a point below the center of gravity, whereas the text of the specifications applies the retarding force initiated by the hook at the center of gravity.
•If plaintiff’s patent is valid, the point of attachment of the hook is one of prime importance and vitally involves' the elimination of “nosing over” and the longitudinal and lateral equilibrium of the plane in making a landing.
There is no evidence that Le Mesurier’s patent was ever adopted by the Navy or accorded favorable consideration by those skilled in the art. The record abundantly supplies proof that the position of the hook indicated by Le Mesurier would in making a landing of a plane on a ship’s deck almost certainly subject it to “nosing over” and yawing. Courts in the consideration of prior art patents may only consider what the patentee has contributed to the art, and in arriving at the extent of the contribution ascertain the same from what is disclosed on the face of the granted patent. Naylor v. Alsop Process Co., 168 Fed. 911 (C. C. A. 8). We think Finding 29 is sustained by the record.
Eugene B. Ely, an experienced and skillful pilot, did in 1911 accomplish a successful landing of an aeroplane on an especially constructed deck of the U. S. S. Pennsylvania, at the time moored in San Francisco Harbor. Ely’s feat was a spectacular one, performed in the presence of a number of scientific personages and other students of aviation then in attendance at a so-called “aviation meet.” It was given extensive publicity both by the local newspapers and scientific journals. Lack of detailed knowledge of Ely’s landing gear does not obtain, and a complete and accurate knowledge of precisely what he did is available.
The plane used by Ely was of the Curtiss pusher type, a slow and light plane equipped with a three-wheel landing gear, a type of plane for some time past entirely obsolete. *36 Upon the special deck of the vessel a number of ropes— to be exact, twenty-two — were stretched transversely at intervals across the same, positioned a few inches above the deck and sustained therein by beams laid longitudinally, the ropes being held in position by sandbags1 of equal weight attached to each end thereof.
Upon the center brace or central skid of the plane, as it is called, three sets of hooks, five in all, were mounted, being spaced about eighteen inches apart. These hooks were pivotally mounted and resiliently held in position by springs and disposed below the center of gravity of the plane in the rear of the same, extending downwardly a sufficient distance to engage the transverse ropes after the plane had landed.
Ely’s landing gears were incapable of retarding a plane in flight. From the United States Naval Institute proceedings we quote this language:
There were no other special fittings, and the machine landed on its rubber-tired wheels, as upon ordinary occasions.
As a matter of mechanical operativeness Ely’s gears depended for efficiency upon the ability of the pilot to make a perfect landing and did not function to retard speed until after this was accomplished. The control of the longitudinal and lateral equilibrium of the plane remained exclusively with the pilot.
From the photographs in the record and the accounts of spectators,1 it is established that the hooks on the Curtiss plane used by Ely were disposed of in the following manner, i. e., the forward hooks were below and forward of the center of gravity of the plane and the rear hooks were in the rear of the same. The Curtiss plane used by Ely was, as previously observed, equipped with as front elevator and three landing wheels, one of which was located quite a distance in front of the main body of the plane, the other two positioned opposite each other and located under the trailing edge of the lower wing.
The triangular construction of the wheel base enabled the pilot to disregard the danger of nosing over; the loca *37 tion of the front wheel prevented it, and it is not disputed that the application of a retarding force capable of eliminating this dangerous factor must take into consideration the center of gravity of the plane.
The landing gear devised by Ely was not adopted by the Navy. It did not solve the problem involved, and it does not detract from Ely’s skill and fearlessness to say that his feat was concededly accomplished amidst a concerted opinion that it was hazardous in the extreme, with safety assured to the pilot and plane upon the single condition of a perfectly normal landing of the plane within the landing area. Landing gears embodying this type do not embrace the scientific principles of the patent in suit.
The defendant in argument, citing many alleged prior art patents which we deem it unnecessary to discuss, insists that “a mere tyro would know that any large moving-body, to be retarded in movement, must have the retarding force applied thereto in the rear of its center of gravity, and in alignment therewith, in order to prevent a resulting centrifugal movement, as distinguished from a retarded linear movement.”
To sustain the argument, it is pointed out that in the beginning of aerial flight it was recognized that braking force was an essential factor in landing a plane, and that practically all, if not all, mechanical devices employed for the purpose were located in the rear of the fuselage and the center of gravity of the same. Mechanical formations in shape and form akin to plowshares, and other pointed and rounded devices located as above stated, were employed to dig into the earth after the plane landed thereon and retard its speed.
Of course, it is again insisted, it was a perfectly natural step from ground retarding devices to the use of hooks to engage cooperative mechanisms in the retarding process. If the application of a mechanical device to control the scientific factors incident to landing an airplane is so obvious and simple, why did the Navy seek substantial appropriations to enable experiments to be made, and why were those experiments carried forward continuously?
*38 says process and the acute difference of opinion ascertainable from the record as to the perfection and operativeness of existing landing gears is at least impressive and indicative of the fact that the problem to be solved is not so simple as to be immediately disposed of. Landing an airplane in flight within the limits of a restricted landing area involves human life and expensive property, and a subject-matter of such importance has, as it should, attracted the inventive genius of those skilled in the art both in this country and abroad.
PRIOR PUBLICATIONS RELIED UPON
In 1918 and 1919 the British were conducting at the Isle of Grain a series of experiments with arresting devices, and Lieutenant Hague was stationed there to observe the same. The lieutenant prepared a report of what he witnessed. The report was revamped by Navy officers stationed in London and finally transmitted in typewriting to the Navy Department in Washington. The report is marked “Confidential.”
In 1919 a printed publication known as “Jane’s All the World’s Aircraft” contained a disclosure of a method of. landing or arresting airplanes. In the same year “Aeronautical Engineering” appeared, and in 1920 “Jane’s All the World’s Aircraft” referred to the British experiment at the Isle of Grain. To discuss these publications in the way of the detailed disclosure of retarding gears mentioned' is, we think, not essential. They are part of the findings by reference and in our opinion Findings 27 and 28 are amply supported by the record.
All the publications relied upon disseminate knowledge of but do not solve the problem in issue in this case. The mechanisms experimented with do not disclose the essential operative elements of plaintiff’s patent, and, so far as utility and practicability are concerned, served only to accentuate the necessity of much additional development in order to create an operative mechanism. The landing gears disclosed failed in each instance to comprehend the manner in which the incidents of landing an airplane may be con *39 trolled. They simply did not work to the satisfaction of all interested in aviation, and do not teach the principles of plaintiff’s patented gears.
The effort to establish inventive contribution by the Navy to the plaintiff’s retarding system fails. The plaintiff’s contacts with naval officials involving his disclosures and tests were manifestly designed to procure the approval of the same and secure its adoption. Naval officials very properly aided plaintiff in the way of supplying facilities for the tests, and of course made suggestions as to changes in details. The relationship existing between plaintiff and the Navy officials was one of mutual good will, the plaintiff freely and willingly disclosing his conception and the officials with equal candor expressing their views with respect to the same. Findings 10,11,12,13, and 14 are sustained by the record.
Defendant stresses the experimental course of the Navy in an effort to produce a satisfactory mechanism for landing a land plane upon an airplane carrier. The sequential history of the art is traced with minuteness and from it a conclusion is deduced that each element of plaintiff’s patent was old in the art and hence is of an aggregative character. Familiar cases are cited to sustain the claim.
In the first place, the force of the argument is seriously weakened by the continuous, strenuous, and expensive experimentation of the Navy. If a simple aggregation of elements, old in the art and of familiar functioning capacity, was so readily available to accomplish the purpose, it is obviously strange that those skilled therein in both this and foreign countries did not combine them before the plaintiff did.
The prior patented art exhaustively searched and cited by defendant concededly failed to furnish the Navy with a single acceptable mechanism. After tests of certain ones not a single one was accepted or utilized. Surely from this extensive effort to solve the problem some scientific information would have inevitably furnished sufficient information that all that was needed were hooks, poles, transverse cables, and universal joints. What the plaintiff did was not only to utilize the known functioning capacity of the ele *40 ments be employed, but to combine them by a process of location and combination in such a way as to overcome the difficulties inherent in making a landing of a plane within the desired area. He invented a new and novel landing mechanism. United States v. Bethlehem Steel Co., 258 U. S. 321; Richmond Screw Anchor Co. v. United States, 275 U. S. 331.
INFRINGEMENT
The defense to infringement is anticipation and lack of novelty. It is argued that the novel feature of plaintiff’s mechanism, residing in retarding an airplane while still in flight, is not infringed because the pilots of defendant are instructed and do not apply defendant’s mechanism while the machine is in flight, it not being denied that defendant uses a landing mechanism and has used it successfully in at least two hundred instances.
It may be that defendant’s pilots are so instructed; nevertheless, what does “still in flight” mean? Defendant says “the planes drop down to landing syeed which automatically deprives the pilot of flying control.”
Plaintiff’s testimony shows “They (the planes) slow down just the same as they would for the landing of the plane. They could not come in slower and it is not advisable to come in faster.” Assuredly, it may not be said that a plane is not “still in flight” when it descends in the air preparatory to making a landing. Many times prior to contact with the landing area the pilot may, if he wishes, ascend again and decline a landing.
Defendant’s exhibit No. 12 is a blue print disclosing in great detail the landing mechanism used by the defendant. It is marked “General Type Plan Airplane Arresting Gear Equipment, Navy Department, Bureau of Aeronautics.” This exhibit discloses the various attitudes of a plane and the process of landing upon the deck of a ship or an airplane carrier. There are four separate drawings. The first indicates that the mechanism can be operated while the plane is in flight; in fact, the drawing shows the plane in flight. The second likewise discloses the plane in flight and the landing mechanism available for operation, and the same is true *41 of the third figure. In figure 3 this notation appears — “Hook engaged and pulling, plane is being drawn down to deck”, so, manifestly, the plane is in flight. Figure 4 is the only one which discloses the plane as having landed. This exhibit seems to irrefutably establish the fact that the landing mechanism used by the Navy will operate to retard the speed of the plane while still in flight.
We fail to find in the record that defendant’s mechanism is of such a nature that it is restricted to operativeness only after a plane has landed. It may be true a naval official preferred to first land the plane and then apply the retarding force during the roll, but this was a matter of preference and does not detract from the recognized fact that defendant has provided the necessary structure to apply the retarding force to the plane while in flight and prior to the roll. Findings 5 and 6 disclose in detail defendant’s mechanism. In view of the same, it is, we think, impossible for defendant to escape from a charge of infringement. In the case of Wright Co. v. Herring-Curtiss Co., 204 Fed. 597, 614, the court said:
The defendants have embodied in their aeroplane the various elements of the claims in suit. While it is true, as pointed out herein, that the defendants have constructed their machine somewhat differently from complainant’s, and do not at all times and on all occasions operate the same on the Wright principle, yet the changes they have made in their construction relate to the form only. They have constructed their machine so that it is capable of restoring equilibrium in substantially the same way as is complainant’s machine, and the evidence is that on occasions, depending upon aerial conditions or other disturbing causes, they use the vertical rudder, not only to steer their machine, but to assist the ailerons in restoring balance.
See also Westinghouse Electric & Mfg. Co. v. Royal-Eastern Electrical Supply Co., 9 Fed. (2d) 897.
It is not difficult after years of experimentation to challenge a patented device which eventually solves the problem long involved and intricate. In the development of any art certain instrumentalities suggest themselves to inventors and they apply them in repeated efforts to perfect a device. *42 The plaintiff, whose qualifications are not challenged, conceived the vital necessity of applying a retarding force to an airplane while in flight, in such a way as to. assure the safety of the pilot and the plane, and' to accomplish this involved a knowledge of aeronautics and the scientific factors which attend such an act. The assembly of a mere machine was not in any sense sufficient.
Judgment in favor of the plaintiff, the entry of which will be reserved pending the taking of testimony by a Commissioner of the court upon the question of reasonable and entire compensation.
Whaley, Judge; Williams, Judge; Littleton, Judge; and Green, Judge, concur.